1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3      UNITED STATES OF AMERICA,

 4        vs.
                                      Criminal No. 09-320
 5      HARDY LLOYD,
                        Defendant.
 6

 7                            - - -

 8

        Transcript of proceedings on September 26, 2017 United
 9      States District Court, Pittsburgh, Pennsylvania, before
        Judge Robert C. Mitchell.
10

11
        APPEARANCES:
12
          For the Government:    U.S. Attorney's Office
13                               Stephen Kaufman, Esquire
                                 U.S. Courthouse
14                               700 Grant Street
                                 Pittsburgh, Pennsylvania 15219
15
          For the Defendant:     DeForest Koscelnik Yokitis Skinner &
16                               Berardinelli
                                 David Berardinelli, Esquire
17                               436 Seventh Avenue
                                 3000 Koppers Building
18                               Pittsburgh, Pennsylvania 15219

19        Court Reporter:        Barbara Metz Leo, RPR, CRR
                                 700 Grant Street
20                               Suite 6260
                                 Pittsburgh, Pennsylvania 15219
21

22

23

24
            Proceedings recorded by mechanical stenography;
25      transcript produced by computer-aided transcription.
```

2

1              P R O C E E D I N G S

2                    9:35 a.m.

3          THE COURT:  Do you want to be seated, please?

4          This is the preliminary supervised release revocation

5  hearing in the case of the United States versus Hardy Lloyd at

6  criminal No. 9-320.

7          Sir, are you Mr. Lloyd.

8          THE DEFENDANT:  Yes.

9          THE COURT:  Are you represented by Mr. Berard --

10         MR. BERARDINELLI:  Berardinelli.

11         THE COURT:  Mr. Kaufman, you're appearing on behalf

12  of the government?

13         MR. KAUFMAN:  Yes, Your Honor.

14         THE COURT:  Do you want to proceed, please?

15         MR. KAUFMAN:  Yes, Your Honor.  I call Patrick

16  Sumansky.

17      (Witness sworn.)

18         THE CLERK:  Have a seat in the witness box.

19         PATRICK SUMANSKY, a witness herein, having been first

20  duly sworn, was examined and testified as follows:

21                    DIRECT EXAMINATION

22  BY MR. KAUFMAN:

23  Q.  Would you please state your name, sir, and spell your last

24  name?

25  A.  Patrick Sumansky, S-u-m-a-n-s-k-y.

1    Q.  How are you employed, Mr. Sumansky?

2    A.  I am a United States probation officer in the Western

3    District of Pennsylvania.

4    Q.  And are you the probation officer assigned to supervise

5    Mr. Lloyd while he's on supervised release?

6    A.  That is correct.

7    Q.  Could you briefly explain your educational background and

8    your work history?

9    A.  Graduated from Slippery Rock University in 2003.  Worked

10   at the Butler County Prison.  Transferred to Arizona.  Became

11   a county probation officer in 2006.  Worked there for

12   approximately eight and a half years, and then became employed

13   as a United States probation officer in the District of Nevada

14   for approximately a little over two years and then transferred

15   to this district.

16   Q.  You have been here in this district since January of this

17   year; is that correct?

18   A.  Yes, sir.

19   Q.  Mr. Sumansky, where was Mr. Lloyd incarcerated or in

20   custody prior to beginning his term of supervised release?

21   A.  The Renewal Center which is a halfway house in Pittsburgh.

22   Q.  And before he was released from Renewal, did you learn

23   about the apartment to which he had planned to move?

24   A.  Yes, I did.

25   Q.  Is that apartment in Dormont, Pennsylvania?

1    A.  That's correct.

2    Q.  Did you conduct an inspection of that apartment on or

3    about July 10, prior to Mr. Lloyd's release from Renewal?

4    A.  Yes, sir.

5    Q.  Tell us briefly how you conducted that inspection.

6    A.  Whenever I conduct an initial home inspection -- or prior

7    to them being released, I go out to the residence.  I do a

8    walk-through.  I have them open the doors so I can see

9    entrances and exits to the property.  I met with Hardy's

10   father, John Lloyd, who walked me through his property.

11   Q.  Did you see any items that you considered to be weapons in

12   the apartment at that time?

13   A.  I did not.

14   Q.  What date was Mr. Lloyd released from Renewal?

15   A.  It was approximately July 21st, if I recall.

16   Q.  And did another probation officer named Ben Orrison go

17   over Mr. Lloyd's conditions of release with him?

18   A.  That's correct.

19   Q.  Was that on or about July 24?

20   A.  Yes, sir.

21   Q.  And then did you conduct another residence visit on or

22   about July 25 with Mr. Lloyd present?

23   A.  Yes, sir.

24   Q.  And again, the same manner, can you tell us what, if

25   anything, transpired in that visit?

1    A.  Similar to the prerelease inspection, I walked through

2    with Hardy.  He showed me all the entrances, exits of the

3    apartment.  Went into the bedroom, living room, kitchen,

4    bathroom area of the residence.

5    Q.  Did you see any items that you considered to be weapons in

6    the residence at that time?

7    A.  I did not.  We only conduct plain view walk-through of the

8    house.

9    Q.  Mr. Sumansky, let me move then to August 3rd, a week or so

10   later.

11       Did you meet with Mr. Lloyd on that date to go over a

12   proposal to obtain his consent to certain computer monitoring

13   conditions?

14   A.  That is correct.

15   Q.  And can you tell us about that meeting with Mr. Lloyd?

16   What transpired?

17   A.  We had discussed modifying his conditions to allow him to

18   access the Internet with special conditions.  The original

19   petition, I had placed three words in there:  Terrorism,

20   hatred and extremism.  He wasn't comfortable with two of those

21   words, so we struck those.  I came back at a later time and

22   placed only terrorism, which he was comfortable with.

23   Q.  So in other words, he objected to being prohibited from

24   accessing the Internet to look for things related to extremism

25   and hate; is that correct?

1    A.  Correct.

2    Q.  And you agreed to redact those; is that right?

3    A.  That's correct.

4    Q.  Is that because of First Amendment concerns?

5    A.  Yes, sir.

6    Q.  And so on August 8, did you meet with Mr. Lloyd to have

7    him sign the agreed upon modifications to his computer

8    conditions?

9    A.  Yes, sir.

10            MR. KAUFMAN:  Your Honor, with the court's

11   permission, I would like to put the whole stack of exhibits

12   before Mr. Sumansky.

13            THE COURT:  Has counsel received a copy of them?

14            MR. BERARDINELLI:  I have, judge, and I have reviewed

15   them.  I have no objection.

16            THE COURT:  Thank you.

17            MR. KAUFMAN:  Your Honor, those are Exhibits 1

18   through 18.  There are certain sub exhibits A, B, C and D.

19            Mr. Berardinelli, do you have any objection to

20   admitting them all in mass?

21            MR. BERARDINELLI:  No.  I think that's preferable.

22            THE COURT:  Thank you.

23            MR. KAUFMAN:  We do move to admit Exhibits 12 through

24   18, including any subparts to those exhibits.

25            THE COURT:  They will be admitted.

1    Q.  Let me ask you to look at Exhibit 1 first, Mr. Sumansky,

2    and on the very last page, are there signatures?

3    A.  Yes, sir.

4    Q.  Whose signatures are those?

5    A.  Mine and Hardy Lloyd.

6    Q.  And what is the date that it was signed?

7    A.  August 8, 2017.

8    Q.  And did you go over these conditions with Mr. Lloyd before

9    you both signed on the last page?

10    A.  Yes, sir.

11    Q.  And again, I don't want to go through the whole thing, but

12    if you look at the very -- page 4, the very last paragraph,

13    the very last sentence is "The defendant also shall abide by

14    the provisions of the computer restrictions and monitoring

15    program approved by the court"; is that correct?

16    A.  That is correct.

17    Q.  Is that a separate document?

18    A.  Yes, sir.

19    Q.  And did you file this then, this Exhibit 1, with the court

20    on or about August 9, 2017?

21    A.  Yes, sir.

22    Q.  Let me move to Exhibit 2 then.  Is this the actual

23    computer restriction and monitoring program rules and

24    participant agreement referred to in the previous document?

25    A.  Yes, it is.

1    Q.  And was this document also gone over with Mr. Lloyd?

2    A.  Yes, it was.

3    Q.  And if we look at the very last page, are there signatures

4    on that page?

5    A.  Yes, sir.

6    Q.  And what is the date of those signatures?

7    A.  August 10, 2017.

8    Q.  And do you know who went over these conditions with

9    Mr. Lloyd?

10   A.  Pete Gawlinski.

11   Q.  And do you believe that's Mr. Gawlinski's signature and

12   Mr. Lloyd's signature?

13   A.  I do.

14   Q.  And again, with respect to this document, let me just

15   refer you to paragraph 7 on page 2, and does that say anything

16   about having other individuals access the Internet on behalf

17   of Mr. Lloyd?

18   A.  It does say that.

19   Q.  Can you just read, please, the first two sentences?

20           MR. BERARDINELLI:  What paragraph, Steve?  I'm sorry.

21           MR. KAUFMAN:  Paragraph 7.

22   A.  "I will not have another individual access an Internet

23   capable device on my behalf for any purpose without the

24   permission of my probation officer.  This includes but is not

25   limited to uploading/downloading Internet content, accessing

1    my e-mail account, and sending/receiving e-mail."

2    Q.  Thank you.  Have you discussed with Mr. Gawlinski what he

3    told Mr. Lloyd at the time he went over Exhibit 2?

4         MR. BERARDINELLI:  I know hearsay is permissible,

5    judge, but I do want to lodge an objection in case it gets out

6    of hand.  Instincts, judge.

7         THE COURT:  We'll note it on the record.

8         MR. BERARDINELLI:  Thank you.

9    Q.  You can go ahead and answer.

10   A.  Yes, sir.

11   Q.  To your knowledge, how did Mr. Gawlinski explain to

12   Mr. Lloyd whether he could use an Internet capable device or

13   not?

14   A.  Pete's typical explanation for all of his offenders that

15   are placed under this condition, he tells them if we're not

16   monitoring the device, don't use it.

17   Q.  And is that in fact the rule that Exhibit 2 sets up, that

18   the offender is not allowed to use any computer device that's

19   not monitored by probation?

20   A.  Yes, sir.

21   Q.  Do you know if Mr. Lloyd made any inquiries of

22   Mr. Gawlinski about whether he could go to a library?

23   A.  Yes, he did.

24   Q.  What happened during that exchange?

25   A.  Pete advised him that he could go to the library.  He just

1  could not use the computer.

2  Q.  Which, if any, devices were going to be monitored by the

3  probation office and was Mr. Lloyd, therefore, allowed to use?

4  A.  Samsung telephone.

5  Q.  And how did the probation office go about putting on the

6  monitoring of that cell phone?

7  A.  Hardy came to the office.  We set up an account for him

8  with gmail.  He was -- we installed the software at the

9  office.  He was then told to go home and finish the process to

10 have the software successfully installed.

11 Q.  Did that occur on or about August 10, the same day that

12 Mr. Gawlinski went over these computer conditions?

13 A.  I believe so.

14 Q.  What happened then?

15 A.  Hardy left the office, went home, attempted to finish

16 installing the software.  He texted me and let me know he was

17 having difficulties.  He ended up removing the software from

18 his phone at that time because he was unable to set up his

19 account.

20 Q.  So what actions then did the probation office take in the

21 next days or week to ensure that that cell phone was

22 monitored?

23 A.  I believe that occurred over the weekend, so the next

24 business day, Pete Gawlinski, Dennis Martin and myself went

25 and met with Hardy to help him successfully install the

1  software.

2  Q.  Where did you meet with Mr. Lloyd?

3  A.  It was South Hills Village Mall.

4  Q.  Near any particular store?

5  A.  I believe it was an AT&T store in the mall.

6  Q.  What happened when you met Mr. Lloyd there?  What did you

7  do with respect to his phone?

8  A.  He gave his phone to us and we were able to set up a gmail

9  account and get the software up and running on his phone.

10  Q.  Was Mr. Lloyd's wife also present at that meeting or in or

11  around the vicinity?

12  A.  Yes, sir.

13  Q.  Do you know if she purchased any computer equipment that

14  day?

15  A.  Yes, sir.

16  Q.  What did she purchase?

17  A.  She purchased a tablet-type computer.

18  Q.  And was that tablet also subject to monitoring by the

19  probation office?

20  A.  It was not.

21  Q.  Was Mr. Lloyd permitted to use that tablet?

22  A.  He was not.

23  Q.  Were there any computer devices other than the cell phone

24  which the probation officer was monitoring that Mr. Lloyd was

25  permitted to use?

1  A.  Any cell phone that would not have Internet capability.

2  Q.  He could use?

3  A.  He could use.

4  Q.  Was there any other Internet capable device other than his

5  cell phone that Mr. Lloyd was permitted to use?

6  A.  No, sir.

7  Q.  As part of these conditions, does the probation office

8  require an offender to inform them of all e-mail accounts and

9  passwords?

10  A.  Yes, it does.

11  Q.  And can you explain whether Mr. Lloyd informed you of any

12  accounts and gave you passwords for those accounts?

13  A.  He did provide me with two of his e-mail accounts.  Pete

14  subsequently got the password to access those accounts, but he

15  did provide me personally with two of his Internet e-mail

16  accounts.

17  Q.  And do you remember what those were?

18  A.  One, I believe, was thereverendhardylloyd@yahoo.com and

19  the other was thereverendhardylloyd@gmail.com.

20  Q.  Those were the only two e-mail accounts; is that right?

21  A.  Yes, sir.

22  Q.  So he did not disclose to you

23  pachurchofcreativity@yahoo.com; is that correct?

24  A.  Correct.

25  Q.  If you could move to Government Exhibit 3.  Do you have

1    that in front of you, Mr. Sumansky?

2    A.  Yes, sir.

3    Q.  Does this appear to be an e-mail thread between Mr. Lloyd

4    and Andy Sheehan, a local journalist?

5            MR. BERARDINELLI:  Object to the form.  No evidence

6    that it's actually between Mr. Lloyd.  The document speaks for

7    itself.

8            THE COURT:  Let's see what the document says.

9            MR. KAUFMAN:  Let me rephrase that.

10   Q.  Does this appear to be an e-mail thread that was printed

11   by Mr. Sheehan?

12   A.  Yes, sir.

13   Q.  And was that provided to the probation office through law

14   enforcement?

15   A.  That's correct.

16   Q.  And what is the date of this document, sir?

17   A.  Monday, August 28, 2017.

18   Q.  And there's actually a little bit of e-mail back and forth

19   on here.  If you look at the bottom of the page, there is what

20   appears to be an e-mail from pachurchofcreativity@yahoo.com,

21   and it says, "This is the church secretary for PA.  Reverend

22   Lloyd will be busy tomorrow but might be able to do an

23   interview.  What is this pertaining to exactly"; is that

24   correct?

25   A.  Yes, sir.

1    Q.  That purports to be from the Church of Creativity church

2    secretary; is that right?

3    A.  Yes, sir.

4    Q.  If we look at the top then, it says this is from Reverend

5    Lloyd; is that correct?

6    A.  It does.

7    Q.  And can you simply just read that next paragraph?

8    A.  This is from Reverend Lloyd.  "Hey, we just finished

9    watching MST3K.  I remember you from 2009.  My wife found a

10   text copy of that report on me, laugh out loud.  I shall be

11   busy tomorrow but might be able to do a phone interview.  We

12   have quite a lot to do this week.  I'm sure you'll get calls

13   about it.  What's the deadline due?  By the way, we are

14   affiliated with the Creativity Alliance."

15   Q.  Did you allege in your petition that this document was

16   evidence of Mr. Lloyd using an e-mail address other than the

17   two that he had given you?

18   A.  Yes, sir.

19        MR. BERARDINELLI:  Steve, where is that in the

20   petition?

21        MR. KAUFMAN:  I'm referring to the petition violation

22   No. 1 under "Nature of Noncompliance."

23        MR. BERARDINELLI:  Thank you.

24        MR. KAUFMAN:  The second paragraph.

25        MR. BERARDINELLI:  Thank you.

1    BY MR. KAUFMAN:

2    Q.  As a follow-up question then, Mr. Sumansky, even -- let's

3    assume for a minute that Mr. Lloyd was not physically at the

4    keyboard typing that first paragraph in but instead leaning

5    over the shoulder of his wife or some other person to type it

6    in.

7        Would that have been a violation of his supervised release

8    conditions?

9    A.  Yes, sir.

10   Q.  Can you explain why?

11   A.  In the agreement that he had signed with Pete, it

12   specifically says third parties are not allowed to access his

13   e-mail accounts or conduct business on the Internet for him.

14   Q.  Moving on then, Mr. Sumansky, let's move to August 17,

15   2017.  Did you receive a call from a police officer in

16   Mt. Lebanon?

17   A.  Yes, sir.

18   Q.  Tell us what happened during that call, sir.

19   A.  I received a phone call from a Mt. Lebanon police officer

20   who advised me that he was at the library in Mt. Lebanon and

21   had witnessed Mr. Lloyd being on the computer and also took a

22   photograph of him on the computer.

23   Q.  And what was the name of that officer, if you recall?

24   A.  I believe his last name was Shipe.

25   Q.  Do you know how Mr. Shipe would have known that there was

16

1    an issue with Mr. Lloyd being on the computer?

2    A.  Mr. Lloyd is well known in the community.  He was

3    recognized.  Various law enforcements were all aware he was on

4    federal supervised release with me, and information was shared

5    through those different law enforcement agencies.

6    Q.  So is it fair to say whenever Mr. Lloyd went on supervised

7    release, there were communications between your office and

8    others with the Dormont police, the Mt. Lebanon police and

9    perhaps other police agencies?

10   A.  Yes, sir.

11   Q.  Did Officer Shipe send you a photograph of Mr. Lloyd at

12   the computer?

13   A.  Yes, he did.

14   Q.  How did he do that?

15   A.  Via text message.

16   Q.  And let me ask you to look at Exhibit 4.  Is that the

17   photograph to which you just referred?

18   A.  Yes, it is.

19   Q.  Does that appear to you to be Mr. Lloyd at the computer?

20   A.  Yes, sir.

21        MR. BERARDINELLI:  We can stipulate it's him, judge,

22   if it makes it easier.

23        THE COURT:  Thank you.

24   Q.  Am I correct this was texted to you at or around 5:26 p.m.

25   on August 17, 2017?

17

1    A.  Yes, sir.

2            MR. BERARDINELLI:  Give me that date and time again,

3    please.

4            MR. KAUFMAN:  August 17, 5:26 p.m., it was texted to

5    Mr. Sumansky.

6            MR. BERARDINELLI:  Thank you.

7    Q.  Were you still on the phone with Officer Shipe when he

8    texted it to you?

9    A.  Yes, I was.

10   Q.  Where was Officer Shipe, according to him, when he texted

11   you the photograph?

12   A.  He was still at the library.

13   Q.  So this was all happening basically simultaneously?

14   A.  That's correct.

15   Q.  Let's move then to August 28 in the afternoon at the

16   Dormont library.  Have you been provided certain photographs

17   from the camera at the Dormont library?

18   A.  Yes, sir.

19   Q.  And how did you obtain those photographs?

20   A.  Through another law enforcement agency.

21   Q.  Would that be the Pittsburgh Police?

22   A.  Yes, sir.

23   Q.  Let me ask you to look through Government Exhibits 5A

24   through 5F which have been admitted, and can you tell me what

25   you see in those six photographs?

1    A.  I see Hardy Lloyd sitting at a computer at the Dormont

2    library.  His hands are on the keyboard.  Appears to be typing

3    and viewing whatever is on the screen.

4    Q.  Okay.  And if you could look at Exhibit 5F, the last

5    photograph.

6    A.  Yes, sir.

7    Q.  There appears to be something on Mr. Lloyd's left arm?

8    A.  Yes, tattoo.

9            MR. BERARDINELLI:  Again, we'll stipulate it's him.

10           MR. KAUFMAN:  Thank you.

11           MR. BERARDINELLI:  Should have told you that before.

12           MR. KAUFMAN:  We can move on.

13   Q.  Let me now move to September 1st, Mr. Sumansky.  First,

14   let me describe -- you told us earlier that Mr. Lloyd had

15   informed you of two e-mail accounts, a Yahoo account and a

16   Gmail account; is that right?

17   A.  That's correct.

18   Q.  And Gmail, of course, is connected to Google; is that

19   right?

20   A.  Yes, sir.

21   Q.  Did you have a password for Mr. Lloyd's Google account as

22   well?

23   A.  Yes.

24   Q.  That's something he provided to you?

25   A.  Yes, it was.

1    Q.  What capability does or did the fact that you had

2    Mr. Lloyd's Google account and his password give the probation

3    office with respect to monitoring Mr. Lloyd's activities?

4    A.  It allows us to access his e-mail, any other accounts that

5    he sets up using that Gmail account.  We would be able to

6    access and view his online traffic.

7    Q.  And on or about September 1st, did officers within the

8    probation office observe any traffic or any activity on

9    Mr. Lloyd's Google account?

10   A.  Yes, sir.

11   Q.  What activity was there?

12   A.  I believe he was viewing a website called Bud K.

13   Q.  So it's BUDK.com; is that right?

14   A.  That's correct.

15   Q.  And is that a website that sells certain products?

16   A.  Yes, sir.

17   Q.  Just generally, what type of products are sold on

18   BUDK.com, if you yourself are familiar with that site?

19   A.  Self-defense type weapons, survival type weapons, mostly

20   weapons.

21   Q.  From monitoring the Google account, did you learn of any

22   activity between Mr. Lloyd's Google account and BUDK.com?

23   A.  Yes, sir.

24   Q.  What activity did you learn of?

25   A.  We had learned that he had ordered something from this

1  website, and there was an order confirmation number sent to

2  his Gmail account.

3  Q.  Could you tell or could the probation office tell from

4  that what product it was?

5  A.  They could not.

6  Q.  Was there a tracking number which gave you the ability to

7  track the package through Fed Ex?

8  A.  Yes, sir.

9  Q.  So what happened after the probation office began tracking

10  the package?

11  A.  They tracked the package to a local Fed Ex facility, and

12  two officers, Dennis Martin and Ben Orrison, went out to that

13  facility.

14  Q.  What happened between those two officers and the employees

15  at Fed Ex on that date then?

16  A.  The Fed Ex employee had opened the package and they had

17  showed them what the contents of that pack was.

18  Q.  Did the Fed Ex employee explain why he or she had opened

19  the package?

20  A.  Yes, sir.

21  Q.  Why was that?

22  A.  To -- their explanation was the package had been damaged,

23  and there was also a metal object in there that they wanted to

24  verify.

25  Q.  And were the contents of that package shown to Officers

1    Orrison and Martin?

2    A.  Yes, sir.

3    Q.  What was the contents?

4    A.  It was a fighting stick-type cane.

5    Q.  And did Fed Ex then, to your knowledge, later deliver that

6    package to Mr. Lloyd?

7    A.  Yes, sir.

8    Q.  Did you or other probation officers then go on the

9    BUDK.com website and print out certain pages related to that

10   particular product, the fighting stick?

11   A.  Yes, sir.

12   Q.  Let me then move to Exhibit 6 and this is 6A.

13        MR. BERARDINELLI:  These are not necessarily what he

14   accessed but what's available on the website he accessed?

15        MR. KAUFMAN:  That's correct.

16   Q.  To be clear, we're not saying Mr. Lloyd accessed these

17   pages.  This is the probation office accessing these pages in

18   their office; is that correct, Mr. Sumansky?

19   A.  Yes, it is.

20   Q.  So if we look at Exhibit 6A --

21        MR. BERARDINELLI:  I'm going to object on relevance

22   grounds.  We have the cane here in court.  The court is going

23   to determine whether it is, quote-unquote, a "dangerous

24   weapon" or not.  Without proof that he actually accessed these

25   pages, the descriptions of the cane or pictures of somebody

1   else using it, I think, have no bearing on the allegations

2   that bring us here today.

3           MR. KAUFMAN:  Our response is that it is relevant

4   because it shows the nature of the product and the possible

5   uses of the product and whether or not it's a dangerous weapon

6   or not.

7           THE COURT:  The objection will be overruled.

8   Q.  So 6A is simply a photograph of the stick and then the

9   ball on the end of the stick; is that right?

10  A.  Yes, sir.

11  Q.  What does 6B show?

12  A.  Somebody using the stick or cane to smash a window out of

13  a vehicle.

14  Q.  And then 6C?

15  A.  Somebody using the stick as a walking device.

16  Q.  And then looking at 6D, how is this product described on

17  6D?

18  A.  It's described as a black thorn shillelagh walking stick.

19  Q.  And on the last page, 6E, is there a price for the

20  particular product?

21  A.  Yes, sir.

22  Q.  And what is the price?

23  A.  $39.99.

24  Q.  And if you look beneath "add to cart," the first line

25  there, what does that say?

1    A.   Traditional shillelagh fighting stick.

2    Q.   Thank you, sir.

3         Let's move then to September 10.  Before I move to

4    September 10, generally in this time frame was there a

5    conversation, to your knowledge, between Mr. Lloyd and

6    probation officer Pete Gawlinski about YouTube?

7    A.   Yes, sir.

8    Q.   And maybe before going further, can you explain the

9    involvement generally of Mr. Gawlinski in this case as opposed

10   to you being the person that solely deals with Mr. Lloyd?

11   A.   Pete is a specialist who specializes in this software and

12   the computer monitoring program.

13   Q.   So what was the nature, again, to the extent you know from

14   Mr. Gawlinski, about the conversation Mr. Lloyd and

15   Mr. Gawlinski had about YouTube?

16            MR. BERARDINELLI:  Same objection, judge, just for

17   the record.

18   Q.   You can still answer.

19   A.   Apparently, Hardy was having some issues accessing YouTube

20   after installing the software on his device, so they had

21   discussed trying to fix that issue.

22   Q.   And so if I'm correct, Mr. Lloyd would be allowed to

23   access a YouTube video on his monitored cell phone; is that

24   right?

25   A.   Yes.

1    Q.   There's no difficulty in Mr. Gawlinski trying to help

2    Mr. Lloyd achieve that; is that right?

3    A.   That's correct.

4    Q.   Through probation's monitoring of Mr. Lloyd's Google

5    account, did probation learn that he was accessing certain

6    YouTube videos?

7    A.   Yes, sir.

8    Q.   And was there anything about his access to those YouTube

9    videos that caught the attention of the probation office?

10   A.   Yes, sir.

11   Q.   What was that?

12   A.   That he was not using his monitored device to access the

13   YouTube.

14   Q.   How did you know that?

15   A.   Through his Google account.

16   Q.   So in other words, the Google account showed access to

17   YouTube, but those same accesses were not shown on the

18   monitoring software on his cell phone; is that correct?

19   A.   Yes, sir.

20   Q.   Now, the access to the YouTube in an unmonitored fashion,

21   was there anything about the particular accesses to YouTube

22   that concerned the probation office?

23   A.   Yes, sir.

24   Q.   What was that, sir?

25   A.   There was 62 videos viewed on YouTube showing females

1    being subdued through the use of chloroform or bonded or

2    gagged in some aspect.

3    Q.  Have you personally viewed some of those videos?

4    A.  Yes, sir.

5    Q.  Were there any -- on his monitored cell phone, was there

6    any evidence of access to YouTube to view videos of the nature

7    you described involving chloroforming, binding and gagging and

8    so forth?

9    A.  No, sir.

10   Q.  Is it a violation of the supervised release terms for

11   Mr. Lloyd to access any type of Internet capable device other

12   than his own monitored cell phone?

13   A.  Yes, it is.

14   Q.  Let's move on then.  Let me move to -- actually, this will

15   be back in time a little bit to August 14.  Was that in or

16   around the events in Charlottesville, Virginia?

17   A.  Yes, sir.

18   Q.  Did it come to your attention that Mr. Lloyd was present

19   for a brief period of time at a protest related to

20   Charlottesville that occurred in Mt. Lebanon?

21   A.  Yes, sir.

22   Q.  How did that come to your attention?

23   A.  I believe it was through the Pittsburgh Post website that

24   was sent to me by various law enforcement agencies and other

25   probation officers.  It was actually a news story that was

1    released with a video.

2    Q.  And did you see that video?

3    A.  Yes, sir.

4    Q.  And did you see a person you believed to be Mr. Lloyd in

5    that video?

6    A.  Yes, sir.

7          MR. KAUFMAN:  Your Honor, I've marked the CD Exhibit

8    7 but I would propose to simply play this short video now.

9          THE COURT:  Sure.  Go ahead.

10    (Video playing.)

11    Q.  Is that the video to which I just referred?

12    A.  Yes, sir.

13    Q.  Subsequent to August 14, did you ever have a face-to-face

14    meeting with Mr. Lloyd where you asked him about involvement

15    in protests?

16    A.  I know I had asked him about that, being involved.  I

17    don't remember the exact date.

18    Q.  Was it after August 14, the date of this video?

19    A.  Yes, sir.

20    Q.  And again, in your own words, tell us what your question

21    to Mr. Lloyd was and what his response was?

22    A.  After all of the events that had occurred in

23    Charlottesville, I had met with Hardy a day or two after that

24    and I asked him, you know, a lot of stuff is going on in the

25    news.  Have you been getting involved in any of these types of

1    protests or rallies, and he said no.  He was staying away from

2    those types of things.

3    Q.  And knowing what you know now, did you consider that to be

4    a truthful answer?

5    A.  I do not.

6    Q.  Let me ask you to look at Exhibit 7A please.

7          MR. BERARDINELLI:  Steve, just so the record is

8    clear, "knowing what you know now" means that video?

9          MR. KAUFMAN:  Yes.

10   Q.  Let me ask you to look at Exhibit 7A.

11   A.  Yes, sir.

12   Q.  Is Exhibit 7A an e-mail printed out as an e-mail of Andy

13   Sheehan?

14   A.  Yes, sir.

15   Q.  What address is this from?

16   A.  Reverendhardylloyd@yahoo.com.

17   Q.  And is that the legitimate -- let me take back legitimate.

18        Is that one of the e-mail addresses that he provided you

19   with as an e-mail address he was using?

20   A.  Yes, sir.

21   Q.  And what is the subject of this e-mail to Mr. Sheehan?

22   A.  I screw up commy rally.

23   Q.  Let me revise what I just said.  It has Andy Sheehan at

24   the top but the to line is actually Hardy Lloyd; is that

25   right?

1    A.  To Hardy Lloyd.

2    Q.  And again, if you could read what this brief e-mail says.

3    A.  "Just walked through a crowd of commies outside a

4    republican MP's office and shouted white power over and over

5    again.  They didn't do jack shit, mates.  Told them we were

6    having our local rally in Frick Park and to show up if they

7    had some balls.  Was wearing my braces and SS T-shirt too.  It

8    was fun.  We'll try to get a pic of them and me when I walk

9    through later today.  Rahowa.  Www.creativityalliance.com.

10   Q.  Do you happen to know what rahowa means, what that's short

11   for?

12   A.  Holy racial war.

13   Q.  Racial holy war?

14   A.  Correct, yes.

15   Q.  Moving on then, sir.  Let me ask you to take a look at

16   Exhibit 8.  Exhibit 8 is on the letterhead of Carnegie Mellon

17   University Police Department; is that correct?

18   A.  That's correct.

19   Q.  And it's entitled "Defiant Trespass Noted" and dated

20   August 31st, 2017?

21   A.  Yes, sir.

22   Q.  And again, the document speaks for itself, but it

23   basically is directed to Mr. Lloyd and advising him he's no

24   longer permitted on the CMU campus; is that right?

25   A.  Yes, sir.

1    Q.  And if you could just read the second sentence of the

2    first paragraph.

3    A.  If you are found -- is that what you want?

4    Q.  No.  The second sentence of the first paragraph.

5    A.  "This is a result of your criminal history involving

6    weapons possession and, therefore, being deemed a threat to

7    the safety and well-being of our university community."

8    Q.  Do you know how this notice was provided to Mr. Lloyd, if

9    it was?

10   A.  Yes.  It was provided in person by a CMU officer and

11   Dormont police officer as well.

12   Q.  And does Mr. Lloyd have a requirement to notify you, his

13   probation officer, within a certain period of time after any

14   contact with law enforcement?

15   A.  Yes, sir.

16   Q.  And did Mr. Lloyd contact you?

17   A.  He did.

18   Q.  What did he tell you?

19   A.  He told me he had contact with two police officers and

20   they had served him with this no trespass order.

21   Q.  And did you have any follow-up conversation with Mr. Lloyd

22   about this notice from CMU?

23   A.  I did, and I asked him why they would have served this

24   order, and he cited the reason in the letter saying that it

25   was as a result of his criminal history involving weapons.

1    Q.  Did you have any conversation with him about whether he

2    had been on the CMU campus or not?

3    A.  Yes, sir.

4    Q.  Tell us about that.

5    A.  I continued to ask him have you been on that property, do

6    you have any reason to return to that property, and he said he

7    had not been to that property.  He had no reason to go there,

8    and he had no problem with this order and would avoid that

9    property from this point on.

10   Q.  Did you receive evidence that Mr. Lloyd had been on the

11   CMU property?

12   A.  Yes, sir.

13   Q.  And let me show you -- have you look at next Exhibits 9A

14   through 9D.

15   A.  Yes, sir.

16   Q.  And who provided these exhibits to you?

17   A.  CMU police officers.

18   Q.  And explain to Judge Mitchell what these four exhibits

19   show.

20   A.  These photos show Mr. Lloyd being in the CMU book store

21   with the date time stamped August 19, 2017 at 1400 hours and

22   three minutes and 23 seconds and various other clips from a

23   surveillance video.

24   Q.  So these are still photographs taken from a surveillance

25   video inside the CMU book store; is that correct?

1    A.  Yes, sir.

2    Q.  And do you recognize Mr. Lloyd in these photographs?

3    A.  I do.

4    Q.  Did you learn from CMU police whether or not there was any

5    other evidence of Mr. Lloyd's presence there other than these

6    photographs?

7    A.  Yes, sir.

8    Q.  What was that evidence?

9    A.  That various Neo-Nazi pamphlets and items had been left in

10   books and some clothing throughout that store.

11   Q.  Let me ask you to look at Exhibits 10A and 10B and just

12   focus on, in the middle of both photographs, there's a front

13   and back of a business card; is that right?

14   A.  Yes, sir.

15   Q.  The front depicts a Nazi symbol with a woman standing in

16   front, and the back states "It's not illegal to be

17   white...yet"; is that correct?

18   A.  Yes sir.

19   Q.  According to the CMU police, can you tell us if any of

20   these business cards were found in the CMU book store?

21   A.  Yes, sir.

22   Q.  How were they found and where?

23        MR. BERARDINELLI:  I'm going to object.  Now we're

24   not just hearsay.  We're talking about documents.  They are

25   comparing the documents they found in his apartment, so these

1   are not what the CMU police gave to anybody.  These are a card

2   found in his house when they do a search and they're going to

3   say this is the same card that was at CMU.

4          At some point, I have to have the ability to

5   cross-examine, and I need to see what was at CMU if we're

6   going to say it's the same card.  They could have went and got

7   it.

8          They have a police department at CMU, a very fine

9   one.  I'm sure they kept the cards.  This line of questioning

10  that this is the same card or similar card, I don't think it's

11  appropriate.

12         MR. KAUFMAN:  Again, Your Honor, I think it's subject

13  to cross-examination, but it's not subject to inadmissibility.

14         THE COURT:  Can we move this along?

15         MR. KAUFMAN:  We'll keep moving.

16  Q.  I think we need an answer to the question.  Do you know

17  from the CMU police where, if anywhere, these business cards

18  were found in the book store?

19  A.  Books and clothing.

20  Q.  Mr. Sumansky, let's then move to, again, the same date,

21  August 19, and I ask you to take a look at Government Exhibits

22  11A through 11D.

23         Are these photographs, again still photographs, taken from

24  a video?

25  A.  Yes, sir.

1    Q.  Who provided these photographs to you?

2    A.  Pittsburgh Police.

3    Q.  Do you recognize Mr. Lloyd in these photographs?

4    A.  Yes, sir.

5    Q.  And where were these -- where is Mr. Lloyd in these

6    photographs, according to the Pittsburgh Police?

7    A.  I believe these are near -- taken near Von Lent Place.

8    Q.  That's in the Shadyside area of Pittsburgh?

9    A.  Yes, sir.

10   Q.  And again, the photographs speak for themselves but does

11   Exhibit 11C appear to show Mr. Lloyd placing something

12   underneath the windshield wiper on a vehicle?

13   A.  Yes, sir.

14   Q.  And 11D shows him walking away; is that correct?

15   A.  Yes, sir.

16   Q.  Did the Pittsburgh Police provide you with a copy of what

17   was placed under the vehicles on Von Lent Street?

18   A.  Yes.

19   Q.  And let me ask you to take a look at Government Exhibit

20   12.  That's a two page document; is that right?

21   A.  Yes, sir.

22   Q.  And is this what the Pittsburgh Police told you was placed

23   underneath those vehicles on Von Lent Street?

24   A.  Yes, sir.

25   Q.  And again, I won't have you read from this, but it's N

1    word owner's manual; is that right?

2    A.  That's correct.

3    Q.  Thank you, sir.

4        Now, did you have discussions with Mr. Lloyd at any time

5    after August 19 about whether he was involved in leafletting

6    or flier distribution?

7    A.  Yes, sir.

8    Q.  Again, tell us about the conversation, what you asked

9    Mr. Lloyd, what he told you.

10   A.  Mr. Lloyd actually volunteered the information without

11   questioning after he had learned of the video that we watched

12   earlier or a news article had been put out about him.

13       He called me somewhat concerned, and at that time, he

14   offered the information that I have nothing to do with the

15   fliering campaign going on around Pittsburgh.  He continued to

16   tell me that he might know who was involved in this type of

17   activity and was willing to give me the names of these people

18   that he thought was involved if they were to do something more

19   egregious than just fliering."

20   Q.  And based on the information that you have, do you

21   consider that to be a truthful statement?

22   A.  No, sir.

23   Q.  Why not?

24   A.  Because the picture that we just reviewed in Exhibit 11A

25   through D show him being on Von Lent Place and placing this

1    paraphernalia under somebody's vehicle.

2    Q.  Was it specifically a September 10 meeting that he denied

3    distributing those leaflets or phone call?

4    A.  I believe so, yes.

5    Q.  Let's move then.  Did the probation office decide to

6    conduct a search of Mr. Lloyd's apartment in Dormont?

7    A.  Yes, sir.

8    Q.  And did that search in fact occur on or about September

9    15?

10   A.  Yes, sir.

11   Q.  And the search was conducted -- and I am leading a bit

12   here.

13            MR. BERARDINELLI:  That's fine.

14   Q.  -- by the U.S. marshals, by the Dormont police and the

15   U.S. probation office; is that correct?

16   A.  Yes, sir.

17   Q.  And during that search, Mr. Lloyd's cell phone was

18   recovered, his wife's cell phone and the Samsung tablet you

19   referred to earlier were all seized; is that correct?

20   A.  Yes, sir.

21   Q.  And then there's also certain items which were physical

22   items that were seized in that search as well; is that

23   correct?

24   A.  That's correct.

25   Q.  Let me go through those items with you.  First Exhibit

1   13A, can you tell us what that is?

2   A.   That appears to be the shillelagh fighting cane that we

3   discussed earlier.

4   Q.   And Exhibit 13B, is that the invoice or the cover showing

5   the order and it being addressed to Hardy Lloyd at his address

6   in Dormont?

7   A.   Yes, sir.

8   Q.   Exhibit 13C, is that simply a picture, a photograph of the

9   box that the fighting cane came in?

10  A.   Yes, sir.

11          MR. KAUFMAN:   Your Honor, we have in court the actual

12  object.   I think that Mr. Berardinelli agreed that the

13  photograph should be admitted as exhibits, but these are here

14  for the court to examine as the court wishes to or as

15  Mr. Berardinelli desires to use them.

16          THE COURT:   Thank you.

17  Q.   Let's move then to Exhibit 14.   What is shown in

18  Exhibit -- let me stop here for a minute.

19      With respect to this item, did the probation charge

20  Mr. Lloyd's possession of that as a violation?

21  A.   Yes, sir.

22  Q.   What violation?

23  A.   Possession of a weapon.

24  Q.   And can you explain why you believe that his possession of

25  that stick is a violation of his supervised release terms?

1    A.   The way it's marketed and its stature and nature, it could

2    be used as a weapon to harm somebody.

3    Q.   Let's move to Exhibit 14.  Does this exhibit show another

4    item seized from Mr. Lloyd?

5    A.   Yes, sir.

6    Q.   What item is shown in Exhibit 14?

7    A.   A punch or push knife attached to his key chain.  His

8    wallet is there as well.

9    Q.   Did you charge this, as the probation office, as being a

10   violation of his supervised release conditions?

11   A.   Yes, sir.

12   Q.   Why?

13   A.   Again, this is a weapon that could be used to inflict

14   bodily injury or serious bodily injury.

15        MR. KAUFMAN:  Your Honor, again, I'm holding the

16   actual object here so the court can see it.  One could hold it

17   like this in your hand with the blade sticking out.

18   Q.   Is that correct, Mr. Sumansky?

19   A.   Yes, sir.

20   Q.   Moving to Exhibit 15, what's shown in Exhibit 15?

21   A.   A small baseball bat wrapped in duct tape.

22   Q.   Again, was this considered a violation by the probation

23   office?

24   A.   Yes, sir.

25   Q.   Why?

1    A.  Again, it's a weapon that could be used to inflict bodily

2    injury or serious bodily injury.

3    Q.  Again, is this the actual weapon, sir?

4    A.  Yes, sir.

5    Q.  Exhibit 16, what's shown in Exhibit 16?

6    A.  Hatchet.

7    Q.  And again, I guess it's obvious.  Why did the probation

8    office consider this to be a violation of his supervised

9    release terms, his possession of this hatchet?

10    A.  It could be used as a weapon.

11    Q.  What about the fact that it could be used for some type of

12    legitimate activity?

13    A.  It could be used for chopping wood.

14    Q.  Is there any -- do you know Mr. Lloyd to do any wood

15    chopping in Dormont?

16    A.  No, sir.

17         MR. KAUFMAN:  And we have that available as well,

18    Your Honor.

19    Q.  Let's look at 17A and 17B.  What's shown in these two

20    photographs?

21    A.  A knife, folding knife.

22    Q.  And when this was seized by the officers that day, how was

23    it described on the inventory; do you recall?

24    A.  It was described as a switchblade knife.

25    Q.  Upon closer examination, is it actually a switchblade?

39

1    A.  After I examined it, no, I don't believe this to be a

2    switchblade knife.

3              MR. KAUFMAN:  And again, this is the actual object,

4    Your Honor.  We have it here.

5              MR. BERARDINELLI:  Do you have the sheath, Steve,

6    that came --

7              MR. KAUFMAN:  I don't believe we have the sheath.

8              MR. BERARDINELLI:  Maybe at the break, we can get

9    that, please.

10   BY MR. KAUFMAN:

11   Q.  Finally, Exhibit 18, Mr. Sumansky.  This appears to be a

12   photograph of a business card; is that correct?

13   A.  Yes, sir.

14   Q.  And was this business card seized during the search on

15   September 15?

16   A.  Yes, sir.

17   Q.  And does this business card show the Yahoo address for

18   Mr. Lloyd that he provided to you?

19   A.  Yes, it does.

20   Q.  But it also shows the pachurchofcreativity@yahoo.com

21   address as well; is that right?

22   A.  It does.

23   Q.  That was the address that was not provided to you; is that

24   correct?

25   A.  That is correct.

1          MR. KAUFMAN:  That's all the questions I have.

2          THE COURT:  Do you want to cross-examine?

3          MR. BERARDINELLI:  Can I have a minute to set up?

4          THE COURT:  Sure.

5                        CROSS-EXAMINATION

6     BY MR. BERARDINELLI:

7     Q.  Officer Sumansky, good morning.

8     A.  Good morning.

9     Q.  Now, one thing you didn't talk with Mr. Kaufman about that

10    you know from supervising Hardy is that he has a long history

11    of mental illness; is that right?

12    A.  That's correct.

13    Q.  And that mental health history is documented, I assume, in

14    your office's files?

15    A.  It is.

16    Q.  And in the PSR for the last -- for his initial charge that

17    is the underlying sentence that brings us here today.

18    A.  Yes, sir.

19    Q.  And as his supervising probation officer, I'm assuming you

20    took the time to read all that background information on

21    Hardy's mental illness?

22    A.  Yes, sir.

23    Q.  And he suffers from a severe version of what's known as

24    Asperger's syndrome, correct?

25    A.  Yes, sir.

41

1  Q.  And that's, if you have the autism spectrum, at the far

2  end of severity on the autism spectrum?

3  A.  To the best of my knowledge, I'm not a licensed therapist,

4  but yes.

5  Q.  And with suffering from Asperger's syndrome, you've seen

6  materials in your own files and in the PSR that indicate that

7  Hardy basically has the emotional capacity of a young

8  adolescent?

9  A.  Yes, sir.

10  Q.  12, 13-year-old young boy?

11  A.  Yes, sir.

12  Q.  And not just the emotional capacity, but from a learning

13  and reactive standpoint, the mind of a young adolescent?

14  A.  According to the documents I've read.

15  Q.  The documents that are in your own files?

16  A.  Yes, sir.

17  Q.  And he has the decision making capacity of a 12 or

18  13-year-old boy?

19  A.  Roughly from what I've read, that's what I believe.

20  Q.  Did you also read one other aspect of his mental health

21  issues is he has an obsessive concern about safety, personal

22  safety?

23  A.  I've read -- I know his previous supervised release term,

24  he was extremely concerned about that, yes.

25  Q.  And do you recall that document in the PSR dealing with

1    his mental health, there were some sentences about his

2    obsession with safety?

3    A.  Yes, sir.

4    Q.  And in fact, you believe Hardy needs mental health

5    treatment?

6    A.  I would say so, yes.

7    Q.  And as part of your supervision of him, you were

8    attempting to arrange that treatment?

9    A.  Yes, sir.

10   Q.  Your office has the ability with certain care providers to

11   marry up a supervisee like Hardy who has severe mental health

12   issues with a therapist or a psychiatrist?

13   A.  Yes, sir.

14   Q.  And in fact, you had put in motion some plans to get Hardy

15   such treatment that he needs?

16   A.  Yes.  Referral was made.

17   Q.  Now, a referral was made, but I want to talk a little bit

18   about the timeline of that referral and how, unfortunately, it

19   didn't really happen in a very expedient fashion, did it?

20   A.  It did not.

21        MR. KAUFMAN:  Your Honor, I think there's some

22   leeway.  I'm going to object to this line of questioning.  I

23   don't believe it goes to probable cause of these violations.

24        THE COURT:  I think it -- I'm going to let you go a

25   little.

1          MR. BERARDINELLI:  Let me explain to you the

2    background, judge.  So you're dealing with a person with the

3    mental and emotional capacity of a 12-year-old who we're about

4    to establish had no mental health treatment for almost two

5    months and is accused of lying to this man on, what I read in

6    the petition and on the record testimony, are some pretty

7    vague questions.

8          So I think his mental health and the syndromes he

9    suffers from and the lack of treatment that he got for them

10   both go to intent on those false statement charges and also go

11   to his capacity to actually have understood the questions and

12   answered them in a truly false way, and that's the root of why

13   I'm asking these questions, judge.

14         MR. KAUFMAN:  Again, Your Honor, we don't really have

15   any evidence about the mental health, other than these vague

16   things from the reports, but a 12 or 13-year-old knows the

17   difference between right and wrong, between truth and lying,

18   so even if we accept that as true, I don't think it's relevant

19   to whether he lied or not.

20         THE COURT:  We'll let you proceed, but one minute.

21         MR. BERARDINELLI:  I've got probably five more

22   questions.

23         THE COURT:  Okay.

24   Q.  So Hardy got out of custody from Renewal on July 21st,

25   right?

1  A.  That's correct.

2  Q.  And he's got a requirement to meet with you within 72

3  hours?

4  A.  Yes, sir.

5  Q.  And you or somebody at your office?

6  A.  Correct.

7  Q.  And he did that, and his father came with him, right?

8  A.  I was not present for the initial meeting.  Ben Orrison

9  conducted that.

10 Q.  You talked about the meeting.  Did you not ask Mr. Orrison

11 who else was present?

12 A.  It was noted in the chronological entries.

13 Q.  And Dr. Lloyd, Hardy's father, was there?

14 A.  I believe so, yes.

15 Q.  And Dr. Lloyd made a specific request, having complete

16 knowledge from being his dad, that Hardy get prompt mental

17 health treatment.  Is that in your file?

18 A.  Yes, sir.

19 Q.  And in fact, an appointment was ultimately scheduled for

20 Hardy to meet with one of your psychiatrists or counselors,

21 correct?

22 A.  A referral was made that same day.

23 Q.  But the appointment wasn't scheduled until September 12?

24 A.  Correct.

25 Q.  So that's roughly, minus a week, a month, two months.  Two

1    month time period.  Seven weeks?

2    A.  Little less than two months.

3    Q.  You would agree with me that all the conduct that's

4    charged in your petition occurs in that seven week period?

5    A.  Yes, sir.

6    Q.  And to your knowledge, Hardy had no mental health

7    treatment during that seven week period?

8    A.  Not that I'm aware of.

9    Q.  Now, when -- what's the gentleman's name who does the

10   computer stuff?

11   A.  Pete Gawlinski.

12   Q.  Officer Gawlinski.  So when Officer Gawlinski met with

13   Hardy to go over the new computer rules -- if I call them the

14   new computer rules, is that okay?

15   A.  That's fine.

16   Q.  Do you know whether Officer Gawlinski had knowledge of

17   Hardy's mental health issues?

18   A.  I believe he did, yes.

19   Q.  And essentially, these computer terms, computer rules,

20   they added new terms to Hardy's supervision, right?

21   A.  That's correct.

22   Q.  Now, you knew, it wasn't me, but Hardy had a lawyer before

23   Judge Schwab appointed me.  A gentleman from the public

24   defenders office.

25   A.  That's correct.

1  Q.  You knew, and Mr. Finkelstein had been in contact with you

2  about Hardy?

3  A.  Yes, sir.

4  Q.  When you were meeting with Hardy, you or your colleague,

5  to put in place these new terms of supervision, did you

6  include Mr. Finkelstein in those conversations?

7  A.  Hardy was given the option to waive a hearing or have

8  counsel, after explaining to him what the new conditions would

9  involve.

10  Q.  And you didn't personally do that.  Pete would have done

11  that?

12  A.  For the original modification, I would have done that with

13  the 12B.

14  Q.  In determining whether, without counsel, you ought to be

15  modifying Hardy's terms of supervision, did you consider in

16  any way the fact that he has the thinking of a 12 or

17  13-year-old boy?

18  A.  Mr. Hardy is very lucid --

19  Q.  Can I have a response to my question, please?

20          MR. KAUFMAN:  I think there's a fact stated in the

21  question with which the witness may not agree.

22          THE COURT:  Can you rephrase the question?

23  Q.  Let me ask it this way:  When you met with my client and

24  had him sign a paper permitting the imposition of these new

25  conditions and waiving the right to counsel, you were aware of

1    his mental health issues?

2    A.  Yes, sir.

3    Q.  Now, would you meet with a 12 or 13-year-old and impose on

4    them new restrictions without having a parent or guardian

5    present?

6    A.  I've never been a juvenile probation officer, but I would

7    imagine that that would be required.

8    Q.  It wouldn't be right to do it, wouldn't it?

9    A.  Correct.

10   Q.  And before you had Hardy sign that counsel waiver, did you

11   even give Mr. Finkelstein the courtesy of a call?  Jay, look,

12   I have got Hardy here.  We're talking about imposing new

13   conditions.  He's waiving his right to have you present.

14   A.  No, I did not.

15   Q.  And I don't recall what exhibit it is, but the court will

16   have it, the new rules, they're six or seven pages in length,

17   right?

18   A.  Correct.

19   Q.  Single spaced?

20   A.  Yes, sir.

21   Q.  Now, is it your understanding that Mr. Gawlinski went

22   through word for word those new terms with Hardy?

23   A.  I believe he actually simplified it for him so it would be

24   in terms that he would better understand so it wasn't

25   monotonous of just sitting down and reading numerous pages.

1    It was simplified for him so he could have a very good

2    understanding of it.

3    Q.   Talked sort of on a very general level, not on a specific

4    level?

5    A.   Correct.

6    Q.   But it's a very specific document, correct?

7    A.   Yes.  There's specific language in the document.

8    Q.   And in fact, some of your charges of alleged violations by

9    Hardy are based on some of that very specific language?

10   A.   Yes, sir.

11   Q.   And sitting here today, you can't tell the court that

12   Mr. Gawlinski specifically went over that very specific

13   language with Hardy?

14   A.   Specifically, no.

15   Q.   I just want to get something clear for the record about

16   what I'm going to call the computer use violations, all right.

17       If I use that term, we're going to talk about the

18   violations under category 1, right, we're on the same page?

19   A.   Yes, sir.

20   Q.   It's not the content of what Hardy was looking at that's

21   at issue, right?

22   A.   Yes, sir.

23   Q.   It's the fact that he was looking at it on a different

24   computer or something like that?

25   A.   Yes, sir.

1   Q.  And so none of the content you're aware of that he

2   accessed while you were monitoring him violated the content

3   restrictions of his supervision, which would be this terrorism

4   restriction?

5   A.  Yes, sir.

6   Q.  Meaning no, they didn't violate the terrorism

7   restrictions?

8   A.  They did not.

9   Q.  In monitoring his Internet access, you did not see him

10  visiting any Aryan Brother or White Power websites, did you?

11  A.  Not that I have seen, no.  Church of Creativity is

12  basically a white supremacist group.  I don't know if you want

13  to consider that as an Aryan Brotherhood, but it is a Neo-Nazi

14  white supremacist.

15  Q.  And do you have logs, records, computer records of Hardy

16  accessing that website?

17  A.  Yes, sir.

18  Q.  You didn't bring them here today?

19  A.  No, sir, and this would have been on an unmonitored

20  device, again, that --

21          MR. BERARDINELLI:  Judge, if I might, I'd like to

22  mark as Defense 1 the actual violation petition signed by

23  Judge Schwab, if I might.

24          THE COURT:  We have that as a matter of record.

25          MR. BERARDINELLI:  I'd like the witness to have a

50

1    copy in front of him.

2             THE COURT:  Go ahead.

3             MR. KAUFMAN:  Could I have the document number?

4             MR. BERARDINELLI:  Docket entry 122.  I have a copy

5    for you if you need one.

6             THE COURT:  I have one.

7             MR. BERARDINELLI:  You're one step ahead of me,

8    judge.

9    BY MR. BERARDINELLI:

10   Q.  Officer, I want to direct your attention to the second

11   page of this document, under the heading "Nature of

12   Noncompliance."

13        Do you see that?

14   A.  Yes, sir.

15   Q.  This is the section where you're explaining to the court

16   the alleged violations from a factual standpoint that

17   Mr. Lloyd, you believe, committed, correct?

18   A.  Yes, sir.

19   Q.  And this deals with the violations of the computer

20   monitoring terms that you and I were talking about that he

21   signed uncounseled?

22   A.  Yes, sir.

23   Q.  Because we're not dealing with the content restrictions,

24   just the mode of access?

25   A.  Exactly, yes.

1    Q.  Now, the first one is this Mt. Lebanon public library

2    visit, correct?

3    A.  Yes, sir.

4    Q.  And do you know how long he was at the library?

5    A.  I do not.  The officer that was there could testify to

6    that.

7    Q.  Now, the public library in Mt. Lebanon has an intranet

8    system as well.  Are you aware of that, that they keep their

9    card catalog, for example?

10   A.  Sure.

11   Q.  So you might be able to go on their intranet system and

12   look up what movies they have or books on tape or actual

13   books, right?

14   A.  Sure.  That can be possible.

15   Q.  It wouldn't violate Hardy's computer restriction

16   provisions to try and see if, you know, he could rent "Bill

17   and Ted's Excellent Adventure" on the intranet system,

18   correct?

19   A.  To my knowledge, Officer Gawlinski had told him not to go

20   on the computer at the library.

21   Q.  I'm asking you, as the supervising probation officer,

22   whether it's a violation of his computer use restrictions to

23   look on a library's intranet, closed system, to see what

24   movies are available at a library?

25   A.  Is that device Internet capable?

1    Q.  It's not interconnected.  Let's -- it's Internet capable

2    but not functioning and communicating with the Internet when

3    it's used as an intranet.

4    A.  Sure.

5    Q.  So he's allowed to do that?

6    A.  He could, as long as there was no access to the Internet.

7    Q.  Now, did you go to the Mt. Lebanon library and get any

8    download from the computer Hardy was working on?

9    A.  No, sir.

10   Q.  So there's been no forensic analysis of what happened and

11   what he was doing on the computer on August 17, 2017?

12   A.  To my knowledge, he was sitting at the computer looking at

13   a screen, so I can't testify to what he was actually looking

14   at or doing.

15   Q.  You can't even testify that he actually got on the

16   Internet?

17   A.  No, sir.

18   Q.  We'll come back to the August 23rd different e-mail

19   accounts.  Let's stay on the libraries while we're there.

20        The third factual allegation you have supporting these

21   alleged violations is the use of the computer at the Dormont

22   public library.

23   A.  Yes, sir.

24   Q.  And are you aware that's similar to the Mt. Lebanon public

25   library?  The Dormont public library computer system functions

1    as an intranet system.

2    A.  Sure.

3    Q.  If Hardy was not accessing the Internet, he would not have

4    been in violation of his conditions.

5    A.  Correct, again, as long as it wasn't an Internet capable

6    device he was accessing.

7    Q.  Did you go get any records from the Dormont public library

8    to see what Hardy was doing on August 28?

9    A.  No.  I'm not sure that that would even be possible.

10   Q.  You don't think it would be possible for the FBI or the

11   U.S. Attorneys Office to hire an expert to go out there and do

12   some computer forensics on that computer and their system logs

13   to see even if, at that relevant time, from that terminal, the

14   Internet, not the intranet, the Internet was accessed?

15   A.  They would have more access to that type of thing with a

16   warrant.

17   Q.  That hasn't been done though?  No one has done that?

18   A.  No, sir.

19   Q.  We have no actual forensic evidence to tell us what Hardy

20   did on August 28, 2017, again, other than he's sitting at a

21   chair looking at a screen?

22   A.  Yes, sir.

23   Q.  He was there, if I was looking at the time stamps on those

24   pictures, for a total of four minutes at that screen?

25   A.  Approximately, sure.

1   Q.  And in one of those pictures, it looks like he's holding a

2   yellow card?

3   A.  Yes.

4   Q.  Are you aware that the library cards for the Dormont

5   public library are yellow?

6   A.  I'm not aware of that.

7   Q.  I guess you're also not aware that his -- he calls her his

8   wife -- at that point had just received a new library card?

9   Are you aware of that?

10  A.  I was not made aware of that.

11  Q.  Did you interview anybody at the Dormont public library?

12  A.  No, sir.

13  Q.  And are you aware -- I assume you're not aware from not

14  having been there, not having done any forensics and not

15  having interviewed anybody there that, in order to activate

16  your library card, you need to go on their computer system?

17  A.  I was not aware of that.

18  Q.  Basically, other than Hardy sitting at a screen for four

19  minutes, we don't know anything else about what happened at

20  the Dormont public library on August 28, 2017?

21  A.  Correct.

22  Q.  The September 1st allegation deals, if I'm understanding

23  it, with the ordering of this cane, right?

24  A.  Yes, sir.

25  Q.  Now, I'm a little confused, so maybe you'll help me out.

1    You were able to see him accessing this BUDK.com website from

2    the software you had installed on his phone?

3    A.  Yes, sir.  It was through his Google account.  It wasn't

4    actually on the phone that we were monitoring, but we had

5    access to his Google e-mail address and account which allows

6    us to see online activity through that.

7    Q.  Do you have any forensic information for Judge Mitchell

8    that will explain to him what device -- what Internet address

9    was used to make the order?

10   A.  I don't recall.

11   Q.  Now, there's nothing inappropriate, given Hardy's

12   supervised release conditions, of him using his phone with

13   your software on it to go to that website and place an order?

14   A.  Yeah, had he done it on a monitored device.

15   Q.  And looking at his monitored device, you were able to see

16   that he had done it?

17   A.  No, not on his monitored device.  We saw it through his

18   Google account.

19   Q.  Through your monitoring mechanisms, you were able to

20   determine that he had ordered this cane?

21   A.  I can't speak to the exact, because Pete is more of the

22   expert in that area.  He was the one that found that.

23   Q.  I hear you, but you're all I've got today.  I don't have

24   Mr. Gawlinski, so I'd like to see what we can do about your

25   understanding.  So let me ask a related question.

56

1        Do you have any logs or records from the monitoring of

2    Hardy's phone that show the websites he accessed on September

3    1?

4    A.  Through the monitored device?

5    Q.  Yes.

6    A.  We would have records of that, yes.

7    Q.  Did you bring them here today?

8    A.  No, sir.

9    Q.  So those records would tell us whether or not he used his

10   phone versus some other device to order this cane?

11   A.  They would, yes.

12   Q.  We'll talk about the cane as a weapon a little later on.

13   Now, I think you said that one thing that caught your

14   attention about the cane was the way it was marketed; is that

15   right?

16   A.  Yes, sir.

17   Q.  Now, are you aware that it's also sold on a website called

18   fashionablecanes.com?

19   A.  No, sir.

20       MR. BERARDINELLI:  I going to mark this -- the

21   petition was not marked, right?

22       THE COURT:  No.  It's part of the record.

23       MR. BERARDINELLI:  We'll mark this as Defense 1.

24   Q.  Officer Sumansky, on Exhibit 1, this appears to be an

25   advertisement for the exact same cane, correct?

1    A.  Yes, it does.

2    Q.  And if you look in the upper left-hand corner, it's from

3    fashionablecanes.com?

4    A.  Yes, sir.

5    Q.  And if you turn over to the second page, there's even a

6    sizing chart for this fashionable cane?

7    A.  Yes, sir.  Still marketed as a fighting stick though.

8    Q.  It is on fashionablecanes.com?

9    A.  Yes, sir.

10   Q.  It's talking about some other products that might be

11   recommended for the person who's interested in this, including

12   some Irish wool imported brown socks?

13   A.  Yes.

14   Q.  Did you do any other Internet research other than your

15   looking at BUDK.com to see how universally this product is

16   marketed to the general public?

17   A.  That was my main focus, because that's where he ordered it

18   from.

19   Q.  I say general public because you can go on and buy it.  I

20   can go on and buy it.

21   A.  Yes.

22   Q.  My 76-year-old dad who has a bad hip can go on and buy it

23   and use it as a cane?

24   A.  Yes, sir.

25   Q.  Because it, in reality, is a cane?

1    A.  Yes, sir.

2    Q.  It's got a rubber tip on the bottom like the HurryCane we

3    see advertised on infomercials?

4    A.  Yes, sir.

5    Q.  The next paragraph is September -- conduct that you're

6    documenting occurred on September 10, right?

7    A.  Yes, sir.

8    Q.  And this is this access to the YouTube video, right?

9    A.  Yes, sir.

10   Q.  And I think, if I heard your testimony on direct, it's

11   okay that Hardy accesses YouTube.  He's not forbidden from

12   accessing YouTube, correct?

13   A.  That's correct.

14   Q.  And the issue is that he apparently didn't do it on his

15   phone; he did it on some other device?

16   A.  Yes, sir.

17   Q.  And I think, if I heard you correctly, he even had a

18   conversation with your colleague, Mr. Gawlinski, about the

19   fact that YouTube wasn't working on his phone?

20   A.  Yes, sir.

21   Q.  So your colleague and, I assume, you through your

22   colleague was aware that he was interested in accessing

23   YouTube?

24   A.  Yes, sir.

25   Q.  So the software somehow that you had placed on his phone

59

1    was not functioning appropriately or was not letting him do

2    that?

3    A.  Yes, sir.

4    Q.  So if he had done this on his own phone, it would be okay,

5    but his own phone wasn't working and he did it somewhere else,

6    and that's why it ends up in the petition?

7    A.  Yes.

8    Q.  Now, you said you personally viewed these videos, right?

9    A.  Yes, sir.

10   Q.  And the content of them, although may be disturbing, is

11   not a violation of Hardy's conditions of release?

12   A.  That's correct.

13   Q.  In fact, you referred to them as gag and bonding.  They're

14   porn, right?

15   A.  Semi-erotic films, yes.

16   Q.  It's not some, you know, pure violence.  It's S and M,

17   disgusting S and M porn?

18   A.  It wasn't like an extreme porn type thing.  It was more

19   focused around the bonding and the actual incapacitating.

20   Q.  But there was an erotic pornography component to these

21   videos?

22   A.  To some of them, yes.  Not all of them.

23   Q.  And as disgusting as that might be to some, Hardy was not

24   forbidden from looking at erotic pornography like those

25   videos?

1    A.   That's correct.

2    Q.   I think the one I skipped over because I wanted to stay on

3    the libraries is the second allegation, this allegation that

4    he used other Internet accounts, correct?

5    A.   Yes, sir.

6    Q.   If I'm understanding your thought process here, it is

7    these e-mails with Andy Sheehan that trigger that allegation,

8    correct?

9    A.   Yes, sir.

10   Q.   We saw in Government Exhibit 7A, at least an e-mail with

11   streaming that Andy Sheehan sent to somebody that is Hardy

12   communicating to him from his disclosed e-mail account,

13   correct?

14           MR. KAUFMAN:   That's Exhibit 3 -- I'm sorry.   7A.

15   A.   Yes, sir.

16   Q.   So it wasn't like Hardy was trying to -- and you have the

17   ability to access and monitor that e-mail account, right?

18   A.   We would be able to, yes.

19   Q.   It wasn't like he was trying to hide, at least in this

20   instance on 7A, his communications with Mr. Sheehan.  He did

21   it on an account you could open and look at?

22   A.   We would have been able to access that through his e-mail

23   account had he provided the log in and password and everything

24   for that.

25   Q.   And that's one he didn't do that for, right?

1    A.   That is one he did provide to us.  I'm not sure.  You

2    would have to ask Officer Gawlinski about what was on that

3    account.

4    Q.   And then I think it's --

5            MR. BERARDINELLI:  I seem to have misplaced it,

6    judge.  Do you mind if I ask him a question from here?

7            THE COURT:  Go ahead.

8            MR. BERARDINELLI:  I like to know the boundaries,

9    judge.

10   Q.   Exhibit 3, do you have it, Mr. Sumansky, it is the other

11   e-mail string.

12   A.   Yes, sir.

13   Q.   And if I'm understanding your issue here, it is that this,

14   at least in form, seems to be Hardy telling somebody to use an

15   e-mail account to communicate on his behalf, right?

16   A.   Both him -- it appears to be him and also using somebody

17   else on his behalf.

18   Q.   When you say it appears to be him, is that because it says

19   this is from Reverend Lloyd?

20   A.   Yes, sir.

21   Q.   Now, that easily could be a third person saying, in

22   essence, Hardy just told me to tell you this?

23   A.   Could be a third person.

24   Q.   Now, have you done any or anybody in the government done

25   any forensic analysis on this pachurchofcreativity@yahoo.com

1    account?

2    A.  No, sir.

3    Q.  Have you even subpoenaed provider records to determine who

4    the account is registered to?

5    A.  No, sir.

6    Q.  And in your investigation, you received a series of other

7    e-mails from Mr. Sheehan that had been sent from this PA

8    Church of Creativity account, correct?

9    A.  That's correct.

10   Q.  There's a series of them, not just this one that's in

11   evidence, right?

12   A.  Yes, sir.

13   Q.  Throughout those series of e-mail, whoever is sending them

14   typically refers to Hardy in the third person, right?

15   A.  Yes, sir.

16   Q.  Just so the court has an example, let's mark as Defense 2

17   this exhibit.  Defense 2 is a Friday, August 18, 2017 e-mail

18   from this PA Church of Creativity account to several news

19   organizations, correct?

20   A.  Yes, sir.

21   Q.  And about in the third line down, it refers to one of our

22   members walked through a commy protest being held in

23   Mt. Lebanon.  That would be a reference to Hardy walking

24   through the protest in front of Congressman Murphy's office,

25   right?

A.  I would assume so, yes.

Q.  It doesn't say I walk through a commy protest?

A.  No, sir.

Q.  And now you found a business card in your search which has this and the disclosed e-mail address both on it, correct?

A.  Yes, sir.

Q.  Other than that business card, do you have any documentary evidence that Hardy Lloyd was the person sending Defense 2?

A.  The signature matches on the way it's signed off every time rahowa.  He uses that same exact signature using that other e-mail address, the PA Church of Creativity.

Q.  The rahowa is a common phrase in the skinhead movement?

A.  Sure.

Q.  This isn't something unique to Hardy Lloyd?

A.  Probably not.

Q.  And it wouldn't be a violation by Hardy if his live-in girlfriend/wife, for example, was the person using this PA Church of Creativity account and sending out e-mails?  She's allowed to send whatever she wants to send, right?

A.  As long as it's not acting as a third party on his behalf, sure, she can do that.

Q.  Did you make any attempt to interview her before bringing these charges?

A.  No, sir.

Q.  And she lived in the apartment where you found the

64

1    business card?

2    A.  She did, yes.  She was hospitalized for quite some time

3    though.

4    Q.  That's a good point.  She was hospitalized for quite some

5    time, right?  Do you know the exact time?

6    A.  I don't, off the top of my head.

7    Q.  She was hospitalized at St. Clair Hospital, correct?

8    A.  That's correct.

9    Q.  Where do you live, sir?

10   A.  In the Pittsburgh area.

11   Q.  I don't mean to put you on the record, but he lives in

12   Dormont.  You can walk, it's a pretty healthy walk, but you

13   can walk from Dormont to St. Clair Hospital, right?

14   A.  Sure, you could.

15   Q.  In fact when you walk from Dormont to St. Clair Hospital,

16   you go right by Representative Murphy's office?

17   A.  Yes, sir.

18            THE COURT:  Do you think it's a good time to take a

19   break?

20            MR. BERARDINELLI:  I would love to take a break,

21   judge.

22            THE COURT:  Do the marshals --

23            THE MARSHAL:  We can use the holding area.

24            THE COURT:  Why don't we take a ten minute break?

25        (Recess taken.)

1    THE COURT:  Do you want to be seated?  Do you want to

2    continue, please?

3    MR. BERARDINELLI:  Thank you, judge.  I would love

4    to.

5    BY MR. BERARDINELLI:

6    Q.  Officer, I now want to turn to violation No. 2 in the

7    petition, and just to set the parameters again, we're not

8    dealing with Hardy's conduct but your belief that he made

9    false statements to you about his conduct?

10   A.  Yes, sir.

11   Q.  For example, he's allowed to be in the CMU book store?

12   A.  Correct, prior to the no trespass order.

13   Q.  You don't have any evidence that he violated the order

14   after it was issued to him?

15   A.  No, sir.

16   Q.  So let's start with the first one, which is the

17   Congressman Murphy protest.  We watched the video.  He was not

18   a protester at the protest.  You would agree with me on that?

19   A.  I don't believe so.

20   Q.  Meaning you would agree with me?

21   A.  I would agree with you, yes.

22   Q.  He was walking down the street, walked through the protest

23   and went on his way?

24   A.  He was anti-protester from what the video shows.

25   Q.  At that same time period in the wake of Charlottesville,

66

1    there were several, to use the common term, white power

2    rallies in the area also, right?

3    A.  Yes, sir.

4    Q.  You don't have any evidence that Hardy attended any of

5    those rallies?

6    A.  No, sir.

7    Q.  So if we look at the first allegation of noncompliance, it

8    is that when you asked -- you write this petition, right?

9    These are your words?

10   A.  Yes, sir.

11   Q.  You write, "The defendant reported to this officer that he

12   has had no involvement with any of the recent protests that

13   have been occurring in the Pittsburgh area," right?

14   A.  Yes, sir.

15   Q.  And so his answer to you when he says I have not, you

16   believe that's false because of his transiently passing

17   through the Murphy protest?

18   A.  Yes, sir.

19   Q.  So that's the basis of your allegation that he violated

20   his supervised release, that four minute video we saw -- or

21   four second video we saw?

22        MR. KAUFMAN:  Objection.  I think it's longer than

23   four seconds.

24        THE COURT:  Okay.  It was short.

25        MR. BERARDINELLI:  It was very short, judge.

1   A.  Correct.  It does show he obviously went and engaged in

2   that protest in his own way.

3   Q.  Did you ever ask him were you at the Murphy protest, that

4   specific question?

5   A.  Not that direct question, no.

6   Q.  Did you ever ask him whether you walked through the Murphy

7   protest?

8   A.  No, sir.

9   Q.  You didn't ever ask him a single question about the Murphy

10  protest, right?

11  A.  The question I asked about him being involved in the

12  protest was prior to him -- me even gaining knowledge of him

13  being at the Murphy site.

14  Q.  So it was in the context of talking about Charlottesville

15  and the white power protests that were occurring here in town?

16  A.  Yes, sir, and it's in relation to all protests just

17  because there's anti-protesting going on and a lot of, you

18  know, hot topic stuff going on, so I was just inquiring with

19  him in a nonconfrontational manner, are you getting involved

20  in any of these types of things, so it is something we could

21  work on together.

22  Q.  You mentioned earlier that his wife was hospitalized at

23  St. Clair Hospital, right?

24  A.  Yes, sir.

25  Q.  On that video, the direction he's walking is in the

1    direction of going to St. Clair Hospital, correct?

2    A.  I believe so, yes.

3    Q.  Did you ever ask him a specific question about any

4    specific rally, Murphy protest or other?

5    A.  No, sir.

6    Q.  Let's talk about Carnegie Mellon.  Have you seen these

7    business cards that were purportedly found in the Carnegie

8    Mellon book store?

9    A.  Yes, sir.

10   Q.  Do you have them in your file?

11   A.  The actual one that was left in the clothing?

12   Q.  Yes.

13   A.  No, sir.

14   Q.  Where is it?

15   A.  Most likely with Carnegie Mellon or it may have been

16   destroyed at this point.

17   Q.  And if I'm understanding, it may have been destroyed?

18   A.  May have, yes.

19   Q.  If I'm understanding your testimony, you believe that

20   Hardy lied to you because those -- that card was found at CMU

21   and you found what you believed to be a similar card in his

22   apartment?

23   A.  Along with the video surveillance.

24   Q.  Now, when you were -- let me back up.

25        This whole conversation of CMU comes up because he calls

69

1    you, right, and says, look, supervising officer, I'm required

2    to contact you if I have an interaction with law enforcement

3    and a bunch of policemen came to my door.

4    A.  Yes, sir.

5    Q.  And they gave me this no trespass order.

6    A.  Yes, sir.

7    Q.  Then I assume Hardy eventually got you a copy of the

8    order, right?

9    A.  He had made arrangements to get me a copy.  We just never

10   met up.  He did agree to give me a copy once we met.

11   Q.  And the conversation where you believe he lied to you is

12   this initial conversation where he calls you and tells you I

13   got this order from CMU, right?

14   A.  Yes, sir.

15   Q.  And you write he reported that he was only issued this

16   order due to his criminal history of gun possession.  That's

17   what you write in your petition, right?

18   A.  Yes, sir.

19   Q.  And is it your testimony that that is false because he was

20   also at the CMU book store?

21   A.  No, sir.  I'm merely stating that because I had previous

22   knowledge that he had been on that campus and had reports from

23   CMU that he had been there.  That's why I was questioning him.

24   Have you been there, and that's when he said no.

25   Q.  Didn't he in fact tell you that he had occasionally cut

1    through the campus when he was in that area but he had not

2    been there recently?

3    A.   Correct.

4    Q.   So let's take a couple steps back.  That sounds a little

5    different from what you told Judge Mitchell on the record.

6                 MR. KAUFMAN:  Objection to commentary by counsel.

7                 THE COURT:  Okay.

8    Q.   If I understood your direct testimony is he told you he

9    wasn't at CMU, and I think you just told you that he

10   occasionally cut through the CMU campus, right?

11   A.   He said he could.  He never clarified had he been there.

12   When I asked him a direct question have you been there, he

13   said no, but it could be used as a route for him to go through

14   there.

15   Q.   When he said it could be used as a route, did you say have

16   you used the route?

17   A.   I don't remember the exact question.

18   Q.   Let's unpack this a little bit.  We can agree that when he

19   reports to you that he was issued this because of a history of

20   gun possession, in fact, that's what the document says, right?

21   A.   That is, yes.

22   Q.   And when there was some sort of questioning about whether

23   he had been at CMU, there was a discussion about he could,

24   might, some word, have cut through there when he's in that

25   area?

71

1    A.   If he needed to go -- I think he said if he needed to go

2    to his dad's house, but he was able to avoid that in any

3    future occasions that he would go there.

4    Q.   Right, because he didn't want to violate the order?

5    A.   Correct.  That's what we were discussing.

6    Q.   You've got no evidence that he violated the order?

7    A.   That's correct.

8    Q.   There was at least some discussion that implies in the

9    past that he had cut through the CMU campus when going to his

10   father's house?

11   A.   Yeah.  There was no indication of when that might have

12   occurred, but it was in a discussion discussing how he can

13   circumvent going anywhere near their property in the future.

14   Q.   Let's deal with the last alleged false statement here.

15   You're the one who writes this allegation up, right?

16   A.   Yes, sir.

17   Q.   And the allegation in your own plain words deals with the

18   anti-Semitic flier campaign, correct?

19   A.   Yes, sir.

20   Q.   You asked Hardy, according to your own words, whether he

21   was involved in the anti-Semitic flier campaign and he told

22   you no, correct?

23   A.   Correct.

24   Q.   You have video surveillance of him in Shadyside putting

25   fliers on cars, right?

1    A.  Yes, sir.

2    Q.  And the flier that he was putting on is Exhibit 12, right?

3    A.  Yes, sir.

4    Q.  Now, as disgusting and offensive as that flier is, it in

5    no manner is anti-Semitic, is it?

6    A.  It's more anti-black.

7    Q.  Correct.  It is.  It's not more anti-black.  It is

8    anti-black.

9    A.  Yes.

10   Q.  Not anti-Semitic at all, is it?

11   A.  It's anti-black.

12   Q.  Does it mention the word Jew or Jewish in any of the two

13   pages of text?

14   A.  No, sir.  That was poor choice of wording on my behalf to

15   use anti-Semitic instead of anti-black.

16   Q.  Do you remember exactly, sitting here today under oath,

17   what you asked Hardy?

18   A.  In my chronological entries that I reviewed, I asked him

19   was he involved in neo-Nazi activity.

20   Q.  But in our petition here where you're asking the court to

21   violate him, you used the word anti-Semitic.

22   A.  Yes, sir.

23   Q.  If you could pull out Exhibit 10A and B, which are the

24   neo-Nazi cards.

25   A.  Yes, sir.

1    Q.  Now, this is a card that you found in your search of

2    Hardy's apartment, right?

3    A.  That's correct.

4    Q.  And you found one card, right?

5    A.  I can't speak to how many cards were there.  I was not

6    present at the search.

7    Q.  Have you reviewed the inventory of what was recovered from

8    the search?

9    A.  What was recovered and what was brought back to the

10   office, from what I understand is, there was a lot of this

11   type of stuff at the house that they did not actually seize.

12   Q.  I want to talk about this card, okay.  Sitting on that

13   stand under oath, do you know whether there was more than one

14   of these cards at Hardy's apartment?

15   A.  I can't answer to that.

16   Q.  And you would agree with me that in the photograph that

17   your colleagues took, this card was amongst several documents,

18   including some appointment card that, at that point, was a

19   year and a month old or a year and two months old?

20   A.  Which appointment card?

21   Q.  I'm looking at 10A, and the Nazi symbol is on top of an

22   appointment card that has a date of 7-18-16 on it.

23        Do you see that?

24   A.  Yes, sir.

25   Q.  And a pamphlet for the Rivers Casino?

1    A.  Yes, sir.

2    Q.  In the photos that were taken of this search, are there

3    any other photos of cards like this, this exact one?

4    A.  I don't believe so.

5    Q.  Let's shift to the last violation which is what I'll call

6    the weapons violation.  Is that all right if I use that term

7    of art?

8    A.  Yes, sir.

9    Q.  What Hardy is prohibited from owning, possessing or having

10   access to are a firearm, right?

11   A.  Correct.

12   Q.  And there are no firearms at issue here, right?

13   A.  Correct.

14   Q.  Ammunition.  No ammunition at issue here?

15   A.  Yes, sir.

16   Q.  And a destructive device, which is a fancy congressional

17   word for a bomb, right?

18   A.  Yes, sir.

19   Q.  No evidence that Hardy had any bombs?

20   A.  Yes, sir.

21   Q.  And he's prohibited from having any other, quote-unquote,

22   dangerous weapon?

23   A.  Correct.

24   Q.  We're dealing with whether this pocketknife and this

25   little black plastic thing are, quote-unquote, dangerous

1    weapons?

2    A.  Yes, sir.

3    Q.  There's got to be some limits on what's a dangerous

4    weapon.  You and I can agree on that?

5    A.  Sure.

6    Q.  Mr. Kaufman, if I angered him, could pick up that computer

7    screen and whack me in the head making it a dangerous weapon,

8    but it's not, sitting on the table, a dangerous weapon, right?

9    A.  Sure.

10   Q.  So there's got to be some rational limits.  So a

11   screwdriver, for example, you could poke somebody's eye out,

12   but Hardy is allowed to have a screwdriver?

13   A.  Yes, sir.

14   Q.  The 9/11 hijackers used box cutters, but he's allowed to

15   have box cutters to open packages?

16   A.  Yes, sir.

17   Q.  Isn't it true that your office has what I'll call a tool

18   exclusion to the dangerous weapons prohibition?

19   A.  Tool exclusion.

20   Q.  You're allowed to have tools?

21   A.  Yes.

22   Q.  Band saw or a wood saw, right?

23   A.  Yes, sir.

24   Q.  Or a screwdriver, right?

25   A.  Yes, sir.

1    Q.  Or some form of Swiss Army knife, for example?

2    A.  Yes, sir.

3    Q.  You would agree with me that Pennsylvania has a specific

4    law that defines prohibited offensive weapons, right?

5    A.  Yes, sir, I've heard that.

6    Q.  You're familiar with that from your training?

7    A.  Yes, sir.

8    Q.  You use that law as a guide for what is deemed a dangerous

9    weapon?

10   A.  Yes, sir.

11   Q.  This cane is not prohibited under Pennsylvania law?

12   A.  I don't believe that fits that category.

13   Q.  This little child's plastic bat taped in duct tape is not

14   prohibited under that Pennsylvania law?

15   A.  I believe it's a wooden bat.

16   Q.  Regardless, it's not prohibited?

17   A.  No, sir.

18   Q.  How much do you think this weighs?  You've handled it,

19   right?

20   A.  Yeah, several ounces.

21   Q.  Doesn't really hurt though, right?

22   A.  If you struck somebody in the head with it, it could be --

23   Q.  Sure.  If you struck somebody in the head with that

24   computer, it could hurt too?

25   A.  Yes, sir.

77

1    Q.  In fact, Hardy had a full-sized baseball bat in his

2    apartment, didn't he?

3    A.  Yes, he did.

4    Q.  You didn't charge that as a dangerous weapon, right?

5    A.  Yes, sir.  Did not.

6    Q.  Meaning you did not charge him?

7    A.  Correct, yes.

8    Q.  Just so the court is aware of that, let's mark this as --

9    I think we're up to Defense -- I'm sorry.  It's in as

10   Government 13A.

11       Government 13A, Officer, just so I walk close, is a

12   picture of the cane beside the actual baseball bat?

13   A.  That's correct.

14   Q.  So in your opinion, as the person who wrote up these

15   charges, Hardy is allowed to have -- it looks like, if this is

16   37 inches, a 33 or 34 inch aluminum bat, but he can't have

17   this child's toy?

18   A.  I wouldn't consider that to be a child's toy in any means.

19   Q.  25 inch Franklin.  You can buy it at Dick's.  I went there

20   last night.

21   A.  Uh-huh.

22   Q.  In the youth baseball section.  So my question to you is,

23   in your opinion, based on the charges you wrote up, Mr. Lloyd

24   is not allowed to have this 25 inch child's bat, but it's okay

25   that he has a 34 inch baseball bat?

1   A.   It being altered with the duct tape appears to be altered

2   so it could be used as a weapon, whereas the baseball bat

3   could be used as a softball.   Maybe he plays softball.

4   Q.   It could be used as a weapon too.   You could club somebody

5   if they broke into your apartment?

6   A.   Sure could.

7   Q.   You could club them with a lot of things?

8   A.   Absolutely.

9   Q.   Mr. Lloyd being on supervised release does not deny him

10  the ability to protect himself in his own home, does it?

11  A.   No, sir.

12  Q.   And we already established early on, as part of his mental

13  illness, he has a phobia about safety?

14  A.   Yes.

15  Q.   Now, I think I never got an answer to my original

16  question.   This is not a prohibited offensive weapon under

17  Pennsylvania law?

18  A.   No, sir.

19  Q.   And this lock blade, not switchblade knife, lock blade

20  knife, anybody who's ever been a hunter knows the difference,

21  is not a prohibited offensive weapon under Pennsylvania law?

22  A.   Correct.

23  Q.   And I think I might have asked you.   The cane is not a

24  prohibited offensive weapon, right?

25  A.   No, sir.

79

1    Q.  And the little plastic spade is not a prohibited offensive

2    weapon?

3    A.  No, sir.

4    Q.  And the hatchet is not a prohibited offensive weapon?

5    A.  No, sir.

6    Q.  Do we have the hatchet?

7    A.  Yes.

8    Q.  Camping ax, right?

9    A.  Yes, sir.

10   Q.  Made by Coleman?

11   A.  Yes, sir.

12   Q.  One of the most foremost known camping companies around,

13   right?

14   A.  Yes, sir.

15   Q.  I think I heard you say if Hardy was out in the woods

16   chopping wood for a fire, that would be okay?

17   A.  If he had a purpose to do that, yes.

18   Q.  So is the difference in whether something is prohibited or

19   not prohibited what the object is or what could be done with

20   it?

21   A.  Obviously what could be done with it, and for our safety,

22   officer's safety purposes, we try to restrict what kind of

23   items people are keeping in their house that could be used to

24   harm us in the line of our duty.

25   Q.  Now, but if he had this out at some state park, that's

1   cool?  That's okay?

2   A.  Sure.

3   Q.  Now, you talked about these home inspections that your

4   office does, right?

5   A.  Yes, sir.

6   Q.  How many times has your office done an inspection of

7   Mr. Lloyd's house?

8   A.  We are only required to do one initial home inspection,

9   one prior to him being released and one after he's released.

10   Q.  My question was how many have you done?

11   A.  Two.

12   Q.  Does that include previously in 2015 and 2016 as well?

13   A.  On his prior supervision?

14   Q.  Yes.

15   A.  I can't speak to that.  I don't know the exact number.

16   Q.  So if you're supposed to do one before and after he was

17   released, he was in prison, got out, you would have done one,

18   right?

19   A.  Yes, sir.

20   Q.  He violated and was put in custody for the better part of

21   a year, right?

22   A.  Yes, sir.

23   Q.  And when he got out, you would have done the visit you

24   talked to us about?

25   A.  Correct.

1    Q.  And it's your testimony under oath that you didn't see any

2    of these five items while you were there during that visit?

3    A.  I did not.

4    Q.  You're not saying they weren't there; you're saying you

5    didn't see them?

6    A.  They were not in plain view.

7    Q.  So you didn't see them?

8    A.  Correct.

9    Q.  But you're not able to tell Judge Mitchell they weren't

10   there?

11   A.  They could have.

12   Q.  In fact, Hardy Lloyd hard wore this knife in a sheath he

13   kept on his belt, right?

14   A.  I've seen the sheath before, yes.

15   Q.  You've seen, when you met Hardy, the sheath on his belt?

16   A.  Yes, sir.

17   Q.  So when you would occasionally visit Hardy's home, he

18   would have a knife sheath on his belt, and this presumably was

19   in it?

20   A.  Yeah, could be, yes.

21   Q.  Now, did you ever tell him, Hardy, open your sheath, you

22   can't have that knife?

23   A.  No, sir, we did not have that discussion.

24   Q.  These are Hardy's keys, right, and it's got this doohickey

25   where you hook it on your belt.  That's how Hardy typically

1    carried his keys, right?

2    A.  That's correct.

3    Q.  When you would meet with him in person, he would have this

4    key ring on his belt much like I have it on mine?

5    A.  I do remember seeing it on one occasion, yes.

6    Q.  On that one occasion, you didn't say to Hardy, hey, Hardy,

7    that plastic spade is a dangerous weapon, you got to give it

8    up?

9    A.  I did not at that time.

10   Q.  Are you aware that Mr. Lloyd has come into this very

11   courthouse through security up to your office with this

12   without any incident?

13   A.  Not that I recall being aware of, no.

14   Q.  But you weren't his supervisor back in 2015 and 2016?

15   A.  No, I was not.

16   Q.  But at least on one occasion, you recall seeing Hardy's

17   keys on his belt, and this would have been on it?

18   A.  Yes, sir.

19   Q.  Did you do any -- let me withdraw that.

20       Back when Hardy was arrested for his first violation in

21   2016, there was a search of his home.  Are you aware of that?

22   A.  Yes, sir.

23   Q.  Now, you weren't here in town in this office at that point

24   in time?

25   A.  No, sir.

1    Q.  Now, have you talked to the folks who conducted that

2    search at all?

3    A.  Yes, sir.

4    Q.  And did any of them tell you in fact this knife was there

5    in 2016 and no one seized it?

6    A.  No, sir.

7    Q.  Did anybody tell you that this little plastic thing was

8    there in 2016 and nobody seized it?

9    A.  No, sir.

10   Q.  That the 25 inch Franklin youth bat was there in 2016 and

11   nobody seized it?

12   A.  Not that I'm aware of.

13   Q.  And that the hatchet was there in 2016 and nobody seized

14   it?

15   A.  I know there was -- I did see photographs of several

16   hatchets that had been seized or photographs.  I can't say

17   seized.  There was photographs of several hatchets on the

18   first search.

19   Q.  Do you know -- as a good probation officer, I'm assuming

20   you reviewed Hardy's prior supervised release violations?

21   A.  Yes, sir.

22   Q.  In that violation, he was charged with dangerous weapons

23   violations, right?

24   A.  Correct.

25   Q.  They are, much like they are here, they listed those

1   weapons?

2   A.  Yes, sir.

3   Q.  The hatchet was not listed?

4   A.  Most likely, correct.

5   Q.  So if all these items, with the exception of the cane,

6   were in Hardy's possession back in 2016 and nobody told him it

7   was wrong to have them, you would agree with me that he would

8   have no reason to think it was wrong to have them in 2017?

9   A.  Yes, sir.

10  Q.  I want to spend a little more time with this knife, this

11  pocketknife.  Now, you were not present at Hardy's, what I

12  call, the 72 hour interview.

13      Do you know what I mean when I say that?

14  A.  Yes, I do.

15  Q.  He has to report to you within 72 hours of being released

16  from custody?

17  A.  That's correct.

18  Q.  I think when we were talking about his mental health

19  issues, we established his dad came with him to that?

20  A.  Yes, sir.

21  Q.  Who conducted that interview for you?

22  A.  Ben Orrison.

23  Q.  You've spoken to Mr. Orrison?

24  A.  Yes, sir.

25  Q.  Have you reviewed his notes of that interview?

1    A.  Yes, sir.

2    Q.  Did Mr. Orrison tell you or do his notes reflect that

3    Hardy asked whether he could carry a pocketknife and

4    Mr. Orrison told him he could?

5    A.  I would have to review the notes.  I don't recall.

6    Q.  And in fact, if Mr. Orrison had told him that and the

7    court would consider this to be a pocketknife, then Hardy

8    would have no basis for believing it was inappropriate to

9    carry this?

10   A.  True.

11   Q.  Your petition refers to this knife as a switchblade,

12   right?

13   A.  Yes, sir.

14   Q.  I think you established on direct that that's not

15   accurate?

16   A.  That's correct.

17   Q.  And that has a big difference, right, because a

18   switchblade is a legal weapon under that Pennsylvania statute?

19   A.  Yes, sir.

20   Q.  As a law enforcement officer, you know the difference

21   between a switchblade and a lock blade?

22   A.  Yes, sir.

23   Q.  And you know the significance that that distinction can

24   have as far as criminal charges?

25   A.  Yes, sir.

1    Q.   When you signed -- let's back up.

2        I don't want to spend too much time because Judge Mitchell

3    is more familiar with these petitions than me, but you're

4    writing this up so the district court judge, in this case,

5    Judge Schwab, can say, yes, I find a basis for arresting this

6    man?

7    A.   Correct.

8    Q.   And because it has such significance, you sign it under

9    penalty of perjury?

10   A.   Yes, sir.

11   Q.   And signing under penalty of perjury here, you described

12   this as a switchblade knife?

13   A.   Correct.

14   Q.   Now you're telling Judge Mitchell that that's wrong?

15   A.   To the best of my knowledge, at the time that's what it

16   was listed as in the evidence recovery report.

17   Q.   And this was in your possession -- in probation's

18   possession in your evidence locker, right?

19   A.   Yes.  I was given the evidence printout which is also in

20   that box.

21   Q.   Now, just this morning, just this morning, you filed a

22   supplemental petition, didn't you, changing a date?

23   A.   Yes, sir.

24   Q.   You didn't change switchblade to lock blade, did you?

25   A.   No, sir.

87

1          MR. BERARDINELLI:  That's all I have, judge.

2          THE COURT:  Mr. Kaufman, anything further?

3          MR. KAUFMAN:  Yes.  I'll be brief, Your Honor.

4                        REDIRECT EXAMINATION

5     BY MR. KAUFMAN:

6     Q.  You were asked on cross-examination about Mr. Lloyd having

7     keys --

8          MR. BERARDINELLI:  Judge, can he wait?  I'd like to

9     sit down and take notes.

10         THE COURT:  Sure.

11         MR. BERARDINELLI:  Thank you, Steve.

12    Q.  Do you recall the question on cross-examination about

13    Mr. Lloyd having this object with keys on it attached to his

14    belt?

15    A.  Yes, sir.

16    Q.  I believe you said you think you saw that on one occasion;

17    is that right?

18    A.  Yes, sir.

19    Q.  On that occasion, did you notice whether or not this spade

20    knife was attached to the keys?

21    A.  I believe it was, yes.

22    Q.  And did you examine it any more closely?

23    A.  No.  It appeared to be like a heart shaped thing attached

24    to his key chain.  I wasn't exactly sure what it was at that

25    point.

1    Q.  And is it all plastic, as far as you can tell?

2    A.  Yes, sir.

3    Q.  So it could go through any metal detector; is that

4    right?

5    A.  Yes, sir.

6    Q.  Now, in your petition, you charged certain items as being

7    dangerous weapons; is that correct?

8    A.  Yes, sir.

9    Q.  It does not have to actually violate Pennsylvania law to

10   be considered a dangerous weapon by the probation office; is

11   that right?

12   A.  That's correct.

13   Q.  And can you give us -- how does the probation office

14   determine what is a dangerous weapon and what is a computer or

15   toaster or something that could theoretically be used as a

16   weapon?

17   A.  Anything that could be used to cause serious bodily injury

18   or bodily injury to us that a person under supervision might

19   use in the way to harm us in the subject of our duty of going

20   to the house and doing our regular visits.

21       We kind of look at it on a case by case basis of what

22   actually appears to be a weapon or may be stored in a place

23   that could be used as a weapon.

24   Q.  And does whether or not it has a legitimate purpose factor

25   into that analysis?

1    A.  No, sir.

2    Q.  Let me go back then to earlier in your cross-examination

3    when you were asked about the access to the computer at the

4    library.

5        Do you recall that line of questioning?

6    A.  Yes, sir.

7    Q.  And do you recall being questioned by Mr. Berardinelli

8    about whether or not he could just be looking at the card

9    catalog or some intranet aspect of the computer?

10       Do you recall that?

11   A.  Yes, I do.

12   Q.  Let me refer you to Exhibit 2, which is the computer

13   restriction monitoring program rules and ask you to go to

14   paragraph 5.

15   A.  Yes, sir.

16   Q.  And beginning with the second sentence, it says, "I will

17   not use any other computer than the one I've been authorized

18   to use"; is that correct?

19   A.  Yes, sir.

20   Q.  And the only computer he was authorized to use here was

21   his cell phone; is that correct?

22   A.  That's correct.

23   Q.  The next sentence says, "This includes but is not limited

24   to computers at other businesses, private homes, libraries,

25   schools, cyber cafes or other public/private locations"; is

1   that correct?

2   A.  Yes, sir.

3   Q.  So the probation office can't tell, if someone is sitting

4   at a computer, what they're doing, but the point is these

5   rules say he can't use other computers period; is that right,

6   sir?

7   A.  Yes, sir.

8           MR. KAUFMAN:  That's all the questions I have, Your

9   Honor.

10          THE COURT:  Anything further of the witness?

11          MR. BERARDINELLI:  I would just like the court to

12  realize this thing they're calling a weapon, you can do this

13  as hard as I physically can, and it makes a little dent in my

14  hand without a problem (demonstrating).

15          THE COURT:  We'll excuse the witness.  Thank you.

16      (Witness excused.)

17          THE COURT:  Mr. Kaufman, anything further?

18          MR. KAUFMAN:  No, Your Honor.

19          THE COURT:  Any testimony on behalf of the

20  defendants?

21          MR. BERARDINELLI:  We have one very, very short

22  witness on one discrete topic, judge, and that would be

23  Mr. Lloyd's father, Dr. John Lloyd.

24      (Witness sworn.)

25          THE CLERK:  Please have a seat in the witness box.

1      MR. BERARDINELLI:  Judge, I'm going to rattle through

2   his background, if that's all right.

3      THE COURT:  Go ahead.

4      JOHN LLOYD, a witness herein, having been first duly

5   sworn, was examined and testified as follows:

6                      DIRECT EXAMINATION

7   BY MR. BERARDINELLI:

8   Q.  You are Hardy's father, correct?

9   A.  Yes.

10  Q.  A retired surgeon?

11  A.  Yes.

12  Q.  Did you accompany Hardy to his initial visit with

13  probation after he got out of custody this past July, July

14  2017?

15  A.  Yes, I did.

16  Q.  And you heard me ask Officer Sumansky whether the notes of

17  that interview reflected any discussion about the ability to

18  carry a pocketknife?

19  A.  Yes.

20  Q.  Can you tell the court what you recall about any such

21  discussion?

22  A.  I recall that Hardy specifically asked about a

23  pocketknife, whether that was admissible.

24  Q.  He was told he could have it?

25  A.  That is correct.

1        MR. BERARDINELLI:  That's all I have for Dr. Lloyd.

2        THE COURT:  Mr. Kaufman?

3                      CROSS-EXAMINATION

4   BY MR. KAUFMAN:

5   Q.  Do you recall the name of the probation officer you met

6   with?

7   A.  It was the one that Patrick had mentioned that was the

8   initial visit.  Patrick was not available at the time.

9   Q.  Where did this meeting occur, sir?

10  A.  Here in the federal building, the probation office.

11       MR. KAUFMAN:  Thank you.  That's all I have.

12       MR. BERARDINELLI:  No further witnesses, judge.

13     (Witness excused.)

14       THE COURT:  Any argument for the defendant?

15       MR. BERARDINELLI:  Yes.  I would like to argue,

16  judge.  I know we have been here longer than you had planned.

17  May I argue from the podium?

18       THE COURT:  Sure.

19       MR. BERARDINELLI:  Judge, when I was asked to take on

20  this case, I had qualms about it because of the beliefs that

21  my client has espoused in the past, and I thought long and

22  hard about it and decided that, you know, he, like any other

23  criminal defendant, needs a competent lawyer, and I agreed to

24  do it.

25       That was really hard for me to do, and I say that

93

only because I think it's really hard for anybody who knows

the philosophies and the speech and the beliefs that Mr. Lloyd

has espoused, to separate that out from a judgment about

specific conduct.  As hard as that is, I'm quite confident the

court will do that.

When you actually look at the conduct here, there's

no violation, and what that leads me to believe, judge, is

that Hardy is here in your courtroom not because he violated

supervised release but because of those beliefs he has

espoused in his past, and that's wrong, so let's talk about

the violations.  Let's start with the weapons, judge.

It's a pocketknife.  You can buy it at Dick's.

Officer Sumansky said he saw it on his belt and didn't do

anything about it.  His dad tells you that they made a

specific question to probation and was told a pocketknife is

okay.  They listed it as a switchblade.  It's not.  They

overreach because they wanted to paint a picture of Hardy

that's not accurate as to this violation.

You can't tell somebody it's okay to have a knife, to

interview him as a supervisee while it's on his waistband and

don't do anything about it and then, two months later, say

that's a prohibited weapon.  There's got to be some element of

notice and frankly due process here.

You can't just say, well, they might be able to hurt

us with it so it's a dangerous weapon because that's gets into

94

1    absurdity eventually.  The knife is not a dangerous weapon.

2         The little plastic thing that I just poked into my

3    hand and my hand is fine is not a dangerous weapon.  No more

4    than a screwdriver could be or the pen I'm taking notes with.

5    And again, Officer Sumansky very candidly tells you it was on

6    his belt when I talked to him.

7         If it's on his belt when you talked to him and it's a

8    prohibited weapon, you better darn sure take it off of him or

9    you can't come back later on and tell him, look, you might be

10   going to jail because you have it, which is exactly what

11   they're doing here.

12        The whiffle ball bat, it's a child's toy.  It's a

13   youth bat.  It's wrapped in duct tape, fine.  The man's got a

14   right to protect himself in his home.  How can you tell him

15   this is illegal but a large giant baseball bat isn't?  There's

16   got to be some consistency here, judge.  This is not a

17   dangerous weapon.

18        And this cane, available on fashionablecanes.com,

19   sure, you can buy it at an outdoor store, but it is what it

20   is, judge.  It's a cane.  And if this becomes a dangerous

21   weapon, then what slope are we on?

22        There's a case in the third circuit called Bagdy,

23   judge, and the cite is this -- it deals with supervised

24   release, and I'll give the court the cite in a minute.  I

25   don't have it handy.  Here's why I cite it, judge.  It dealt

1    with a financial violation.  Defendant had got, I believe,

2    some sort of inheritance, and his supervised release terms

3    told him he only had to pay over ten percent of his gross

4    monthly wages, and he didn't pay over any of the inheritance,

5    and the government moved to violate him.

6            And what the third circuit says is these things have

7    to be specific.  When you're going to charge somebody with

8    another crime and try to put them in jail, they've got to have

9    fair notice of what might put them in jeopardy.

10           You can't come into somebody's house and say you can

11   have that baseball bat, that's okay, but then turn around and

12   say a child's toy or a cane or a camping hatchet is a

13   violation.  And the Bagdy cite is 764 F3rd 287.

14           And I started with the weapons charges, judge,

15   because obviously they are the ones that optically and sort of

16   in everybody's gut are the most offensive serious violations,

17   right.  It's one thing to be in the Dormont library checking

18   out movies, or even if he was on the Internet, it's another to

19   be accused of carrying around prohibited dangerous weapons.

20           These things are not prohibited under Pennsylvania

21   law.  They're not prohibited under federal law.  He was led

22   certainly to believe by the government's own conduct that it

23   was okay to have these things.

24           There's just not a violation on the weapons here, so

25   I think the court ought to find no probable cause on that.

1          I think the false statements are of a similar ilk,

2     judge.  You know, there's a question like have you been

3     involved in recent protests when there have been white power

4     rallies around the city that Hardy hasn't gone to, and he says

5     no I haven't been involved in those protests.

6          Then you're going to violate him because he --

7     literally, it couldn't be more than ten seconds -- walked

8     through a different protest, didn't stop, didn't stay there,

9     didn't come back with a banner.  He just walked through on the

10    way to the hospital to see his girlfriend.  That's not a false

11    statement, and again it's overreaching.

12         Why are we overreaching?  I think the court can draw

13    that distinction, and I don't think also on these false

14    statement charges you can take away the fact of his mental

15    health, judge, in that, he doesn't think like a 30

16    something-year-old man.  He thinks like a 12-year-old.

17         CMU, the context is he got this no trespass order and

18    he's asked, you know, have you been on campus.  Now, on cross,

19    we understand there was some discussion that at least leads to

20    the inference that he had, right.  No follow-up question about

21    it.  How is that a false statement?

22         He calls the officer to say, look, I got this order.

23    I'm supposed to call you.  They talk about it.  He says it's

24    because I have a weapons past and that's what the document

25    says.  Have you been on campus?  Well, I might cut through

1   there if I'm going to my dad's or I could cut through there if

2   I'm going to my dad's.  That's a lie?  That you might send

3   someone to jail over?

4          The fliers?  Look, judge, charges are charges.  As

5   despicable as Exhibit 12 is, it is not anti-Semitic and

6   they've charged Hardy with lying about distributing

7   anti-Semitic literature.  There's just no factual basis for

8   that charge.

9          And again, he's accused of lying.  The conduct -- he

10  can do the conduct.  As despicable as it might be, he can do

11  it.

12         So we've got no weapons charge when you get to the

13  actual weapons and the history here.  You've got no false

14  statement charges.  The Murphy one is not lying about being at

15  the protest or participating in protests.  On the CMU one, the

16  officer admits that there was some discussion about Hardy

17  having been through or potentially going through campus.

18         And on the fliers, he's charged with lying about

19  distributing anti-Semitic literature and there's nothing in

20  the record that shows he was.

21         Then we get down to the computer use, judge, and this

22  one admittedly is a little more tricky for my client, but I

23  think we need to have some common sense applied as well, and

24  although the burden is probable cause, it's still a burden,

25  right?

98

1          So the YouTube videos.  Calls the officer and says I

2     can't get on YouTube, right?  He's allowed to be on YouTube.

3     The computer is malfunctioning.  Maybe he should have waited

4     to view his disgusting pornography.  He didn't.  But is that a

5     supervised release violation when he's allowed to look at the

6     video?  He's called the officer to tell him YouTube doesn't

7     work.

8          The library stuff, judge, you got to come up with

9     more evidence to meet any sort of burden than just say he's

10    sitting at the computer.  That's all they've done.  Where are

11    the records?

12         The e-mail, there's e-mails, the e-mail account,

13    right?  He's sending e-mails to Andy Sheehan from the account

14    that they know about, right?  Why in the world would he, all

15    of a sudden, start using a different one if he's already using

16    the registered one, these e-mails that refer to him in the

17    third person?

18         And at the end of the day, judge, I'll go back to

19    where I started, which is when you actually look at the

20    conduct here and get away from my client's beliefs, get away

21    from what he yelled when he went through that Murphy protest,

22    if there was any other defendant, we wouldn't be sitting here

23    arguing in front of you, in my opinion.

24         And certainly on the weapons and on the false

25    statements, the government has not established probable cause,

99

and frankly, on the Internet-related conduct, with the

exception possibly of the YouTube where there is a factual

violation, even though one that, I think, any rational person

would see wasn't some horrific act because he told the

government he was trying to look at YouTube, that the court

ought to find no probable cause, and Mr. Hardy Lloyd ought to

go back to being supervised because, judge, he needs to be

supervised.  He wants to be supervised.

That structure is good for him and he wants to

continue on it for the amount of time that Judge Diamond

ordered him to be on it, and we're ready and willing to comply

with all the conditions, and we really want to get him mental

health treatment, the treatment he hasn't gotten now for going

on almost two and a half months, and I think the quickest and

best way to do that is for the court, because the evidence

supports it, to find no probable cause on all these charges,

but certainly on the weapons and certainly on the false

statements.

THE COURT:  Thank you.  Mr. Kaufman?

MR. KAUFMAN:  Your Honor, I couldn't disagree more

with Mr. Berardinelli regarding -- first of all, Mr. Lloyd

does not want to be supervised.  That's why he is doing

everything he can to avoid supervision, by using other

computers, using unmonitored computers and keeping weapons in

his house where he is trying to go right up to the line, in

1    his view.

2          We also object to the idea that he is here because of

3    the content of his beliefs.  The most concerning thing, and

4    this is not really the issue before the court, is when you

5    access 62 chloroform videos, that is what's so concerning

6    about someone under supervised release.  That's more

7    concerning, frankly, than any beliefs he may have, so let me

8    go through and explain why the government has clearly shown

9    probable cause for all three of these violations.

10          Just to keep it easier, I'll go in the same order

11   Mr. Berardinelli did.  First, with respect to the weapons, the

12   issue almost anything, as we can agree, could be a weapon.  A

13   computer can be a weapon.  A toaster can be a weapon, what

14   have you.

15          The difference between this bat and the baseball bat

16   that wasn't taken is that was a legitimate baseball bat that

17   can be used.  This is a taped up bat which Mr. Berardinelli

18   even seems to concede is for self-defense.  This is a weapon.

19   It's a dangerous weapon.

20          There is no requirement that this violate

21   Pennsylvania law to be considered a grade C violation and be a

22   dangerous weapon for the supervised release conditions.

23          Clearly this too, he ordered it on a website that

24   deals with weapons.  He did not order it on some fashionable

25   clothing website.  He ordered it on BUDK.com which, as you

1    heard, deals with weapons.

2         The advertisement on BUDK.com shows this hardball at

3    the end being used to smash a windshield.  That's Mr. Lloyd's

4    interest in this weapon, not as a fashionable cane.

5         And the same again for the ax.  Yes, it could be used

6    for camping, but he didn't talk to his probation officer about

7    camping.  He's living in a city apartment.  It's a dangerous

8    weapon that he has.

9         And the spade-type knife, again, the testimony was

10   that probation officer never examined that.  It's plastic.  It

11   can go through metal detectors.  You can hold it in your fist,

12   and it can clearly cause damage to somebody, and I know of no

13   legitimate use -- we have no evidence of any legitimate use

14   for that spade-type weapon.

15        As far as the knife, Mr. Sumansky had the report that

16   that was a switchblade.  It wasn't a switchblade, but clearly

17   four of the five items are dangerous weapons and there's

18   clearly probable cause on that basis.

19        With respect to the false statements, again, as much

20   as the defense wants to make it sound like he's simply walking

21   on his way to St. Clair Hospital, he is a counterprotester, as

22   we saw in the video in Mt. Lebanon.  He yells out white power.

23   He gives the Nazi salute.  He is counterprotesting what

24   they're doing.  Yes, it may be transient, but that's what he

25   decided to do.  He thought so much about it that he sent an

1    e-mail to Andy Sheehan to brag about it.  It's not just a

2    transient walk-through.  He's a counterprotester, and when he

3    denies that type of thing with the probation office, that's

4    lying and that's probable cause.

5            With respect to CMU, again, Mr. Berardinelli elicited

6    that, maybe in the past, Mr. Lloyd mentioned that he might

7    have cut through CMU to see his dad.  That's a far cry from

8    the question that Mr. Sumansky asked.  He asked have you been

9    on that property.  He said no.

10           We have pictures of him in the book store, and he's

11   leaving Nazi cards in the book store there.  Again, another

12   lie.  He was clearly on the CMU property, not just walking

13   through.

14           With respect to the flier campaign, yes, the flier is

15   about blacks.  The wording used by the probation office is

16   anti-Semitic, but as you heard, Mr. Sumansky testified the

17   question he really asked Mr. Lloyd was do you have involvement

18   in Neo-Nazi -- in the Neo-Nazi fliers.  Neo-Nazi, we submit,

19   encompasses anti-black material.  Even the business card that

20   has the Nazi with -- flag with the Nazi and the woman on the

21   front and the back says it's not illegal to be white yet.

22           So there's no question that racism is part of the

23   Neo-Nazi movement, and we submit that's sufficient to uphold

24   that part of violation 2, and again, with violation 1, I think

25   it's very clear-cut.  He was only permitted under supervised

1    release conditions to use one computer device, his monitored

2    cell phone.

3            He ordered the fighting stick not on the monitored

4    cell phone but on another device.  He accessed the chloroform

5    videos not on his cell phone but on another unmonitored

6    device.  He went to Dormont and Mt. Lebanon libraries, and

7    he's caught right there as clear as day at those libraries on

8    computers.

9            As I pointed out on redirect, that itself violates

10   his conditions.  We do not have to show what he's doing on the

11   computer at that time.  And he hides this other e-mail address

12   he's using from the probation office, the PA Church of

13   Creativity e-mail address.  We showed you the one exhibit

14   where he says this is Hardy Lloyd, and either it is him

15   directly saying it using that e-mail address or he is telling

16   someone to write that on his behalf.  Either way, it violates

17   the computer conditions.

18           So we submit all three violations have clearly been

19   shown by probable cause, and we ask you to hold this for

20   court.

21           THE COURT:  From what has been presented, I do find

22   there's probable cause to believe the defendant committed the

23   offenses charged.  Judge Schwab has directed he be held

24   without bail.

25           I do have a question of both counsel, probably

1  Dr. Lloyd if there's no objections, the only professional

2  medical person in the room.  In the over two and a half hours

3  actually that we've met, the defendant has been busy writing.

4  Has only looked up during his father's testimony.

5          Is there any reason that you would feel there's

6  concern for his safety?  I don't know about counsel or

7  Dr. Lloyd.  I know this isn't your field.  It's certainly not

8  ours, but I would express, do you feel there's a reason for

9  concern?

10          MR. BERARDINELLI:  Judge, I think any time you have

11  mental health issues that are going untreated, there's a

12  reason for concern.  If you're asking me whether I think Hardy

13  is suicidal, I don't have any reason, from my interaction with

14  him, to believe that.  He's in protective custody at ACJ.  I

15  don't know what that means or how that helps, but that's all.

16          THE COURT:  Would the marshals please remind them at

17  the jail that the court has expressed concerns about the

18  defendant's mental health?

19          THE MARSHAL:  We will, Your Honor.  We'll pass that

20  along.

21          THE COURT:  Is there anything further?

22          MR. KAUFMAN:  Yes, Your Honor.  I know some members

23  of the media are present here and they've expressed an

24  interest in the exhibits, which are, to my understanding,

25  admitted as court exhibits.  They are public records.  We can

1    refer the media to the court or if the court wishes, we are

2    happy to respond to any requests for the exhibits that were

3    admitted today.  We can do whatever the court desires in that

4    regard.

5            THE CLERK:  We give them back to counsel.

6            THE COURT:  I have no problem giving them to you if

7    the media want to look at them here.  That's fine.  We have no

8    use for them.

9            MR. KAUFMAN:  If I have the court's authorization to

10   deal with the media, and we would not provide anything that's

11   not publicly in the record admitted at this hearing.

12           THE COURT:  If you have no objection, I'll give you

13   back all the copies I have, and you can act accordingly.  Is

14   there anything further?

15           MR. BERARDINELLI:  No.  Thank you, Your Honor.

16           DR. JOHN LLOYD:  I appreciate your concern about my

17   son's mental health for which he wants therapy.  He is not

18   suicidal.  I know exactly what the precautions are at the

19   Allegheny County Jail for suicide prevention, and I hope

20   and -- I hope and pray that he is not put into those

21   conditions.  He is not suicidal in my estimation.

22           THE COURT:  That is some degree of comfort, but we

23   will again emphasize that he is in need of mental health

24   treatment.  We will get this back to Judge Schwab.  We'll get

25   it back to him today.  I don't know when he can set it for a

1    formal hearing, but thank you for your input.  We'll recess.

2              THE CLERK:  All rise.  This hearing is adjourned.

3         (At 12:09 p.m., the proceedings were adjourned.)

4                   C E R T I F I C A T E

5              I, BARBARA METZ LEO, RPR, CRR, certify that the
     foregoing is a correct transcript from the record of
6    proceedings in the above-entitled case.

7

8    _\s\ Barbara Metz Leo_              ___10/10/2017___
     BARBARA METZ LEO, RPR, CRR            Date of Certification
9    Official Court Reporter

10
                        I N D E X
11
     WITNESSES                                         PAGE
12
     PATRICK SUMANSKY
13
         Direct Examination By Mr. Kaufman              2
14       Cross-Examination By Mr. Berardinelli         40
         Redirect Examination By Mr. Kaufman           87
15
     JOHN LLOYD
16
         Direct Examination By Mr. Berardinelli        91
17       Cross-Examination By Mr. Kaufman              92

18

19                      - - -

20

21

22

23

24

25